THIRD DIVISION
December 30, 2010

1-08-0867

No. 1-08-0867

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| DARIUS POLK, | ) | Honorable |
| | ) | Stanley Sacks |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Following a jury trial, defendant was found guilty of the first degree murder of Arthur Levison and of personally discharging the weapon that caused the victim's death, and the attempted first degree murder of Kevin Roberts. Defendant was subsequently sentenced to consecutive prison terms of 25 years for the first degree murder, 25 years for personally discharging the firearm that caused the victim's death, and 15 years for the attempted first degree murder. On appeal, defendant contends that: (1) the trial court erred by denying his motion to suppress his statement where defendant did not understand his right to remain silent, defendant invoked his right to counsel, and the totality of the circumstances showed that defendant's statement was the result of police coercion; (2) the trial court abused its discretion by precluding defendant from presenting expert testimony regarding false confessions; (3) the trial court erred by refusing to allow defendant to question prospective jurors during *voir dire* about their attitudes regarding false confessions; (4) the trial court should have eliminated the "certainty"

1-08-0867

factor from Illinois Pattern Jury Instructions Criminal, No. 3.15 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 3.15) where it was an irrelevant factor in this case; and (5) the mittimus should be amended to reflect the correct number of days defendant served in presentence custody. For the following reasons, we affirm and correct the mittimus.

## I. BACKGROUND

### A. Pretrial Motions

Prior to trial, defendant filed a motion to suppress his videotaped statement made while in police custody. Defendant argued that he did not knowingly and intelligently waive his right to remain silent or his right to counsel and that his statement was the result of compulsion and inducement.

At the hearing on defendant's motion, Chicago police officer William Lepine testified that at about 8:50 a.m., on December 22, 2005, he received a call to proceed to 5301 West Congress in Chicago. Officer Lepine testified that he was advised that an offender of a homicide and aggravated battery was at that location. Officer Lepine was provided with a physical description of the offender and met his partner at the location. Officer Levine testified that he and his partner placed defendant under arrest, handcuffed defendant, and transported defendant to the 15th District police station. Officer Lepine testified that defendant was placed in an interview room that was approximately six feet in width and length, and had a large window looking out into the processing room. Officer Lepine handcuffed one of defendant's hands to a ring on the wall. Officer Lepine did not speak to defendant or advise him of his rights. Defendant remained in the room until about noon when detectives picked him up.

Sergeant Michael Barz testified that in December 2005, he was assigned to investigate

the homicide of Levison and the attempted murder or aggravated battery with a firearm of Roberts. At about 11 a.m. or noon, on December 22, 2005, Sergeant Barz was informed that defendant was being held in custody at the 15th District police station. Sergeant Barz testified that he went to the police station and spoke to the two arresting officers as well as the surviving victim, Roberts. Sergeant Barz testified that Roberts was at the police station but did not have any contact with defendant. Sergeant Barz drove Roberts home while other police officers transported defendant to the Area 5 police station. After taking Roberts home, Sergeant Barz went to Area 5 to speak with defendant.

Sergeant Barz testified that he first interviewed defendant at about 2:50 p.m. Sergeant Barz testified that the interview room contained video-recording equipment that was functioning and monitored by another detective. Sergeant Barz testified that he advised defendant of his Miranda rights by reading each right then asking defendant if he understood. Sergeant Barz testified that he asked defendant his age and learned that defendant was 17 years old and, therefore, Sergeant Barz was not required to have a parent, guardian, or youth officer present during the interview. Sergeant Barz testified that after advising him of his rights, defendant did not state that he wanted a parent, guardian, or attorney present.

Sergeant Barz testified that defendant told him that on the date of the shooting, December 12, 2005, Shawn Wooden picked defendant up from his home at about 11 a.m. or noon. Defendant told Sergeant Barz that he drove with Shawn to Bolingbrook, Illinois, to see Shawn's sister, who was defendant's girlfriend. Defendant stated that he stayed in Bolingbrook until that Wednesday, December 14, 2005. Defendant provided Sergeant Barz with a phone number for Shawn and Sergeant Barz located Shawn in Joliet, Illinois. Sergeant Barz testified that he

explained to Shawn that defendant was in custody and that he needed to speak with Shawn. Sergeant Barz testified that Shawn was paralyzed as the result of being a gunshot victim and used a wheelchair to transport himself. Shawn agreed to come to Area 5 for an interview and arrived at the police station several hours later.

Sergeant Barz testified that Detectives Noradin and Gillespie spoke with Shawn, who did not support defendant's alibi. Shawn told the officers that on the date in question, he had a red Park Avenue vehicle. Sergeant Barz testified that he was aware that at the time of the shooting, a Chicago police portable "pod camera" recorded a red vehicle, possibly a Park Avenue, near the scene of the shooting and a black male exit from the red vehicle.

Sergeant Barz testified that he confronted defendant with the information that Shawn was not supporting defendant's alibi. Sergeant Barz also confronted defendant with the fact that a victim had survived the shooting and the victim knew defendant. Sergeant Barz testified that by this time it was mid-afternoon and defendant had been offered food and drinks, been allowed to use the washroom, and provided with his cigarettes and matches to smoke in the interview room. Sergeant Barz testified that between 5:30 and 5:45 p.m., defendant told the sergeant that he wanted to talk to his Aunt Sholanda on the phone about hiring a lawyer. Sergeant Barz testified that he told defendant that if defendant wanted a lawyer, he would stop talking to defendant. Sergeant Barz also testified that he explained to defendant that defendant did not have to wait to hire an attorney, but, rather, defendant could have an attorney appointed to him. Defendant told Sergeant Barz that he did not want an appointed attorney.

Sergeant Barz testified that he made several attempts to contact defendant's Aunt Sholanda with the phone number defendant provided and Sergeant Barz sent a police car to the

aunt's residence, but she was not home. Sergeant Barz was informed that the aunt was working until midnight and did not have a cell phone. Sergeant Barz testified that defendant then called a different aunt using a phone at the police station.

Sergeant Barz testified that during his conversation with defendant, defendant told the sergeant that he would tell the police what happened if they let Shawn go home. Sergeant Barz testified that, at that time, he still wanted to talk to Shawn about Shawn's whereabouts on the day of the shooting and the assistant State's Attorney also wanted to talk to Shawn. Sergeant Barz testified that defendant also stated that he did not believe that Shawn was actually at the police station. Sergeant Barz had Shawn brought to the door of the interview room and opened the door so that defendant could see him. Defendant then asked to talk to Shawn and Sergeant Barz told defendant that he would not interview Shawn in defendant's presence. Sergeant Barz also told defendant that he viewed a pod camera and saw a red car on the camera with a man exiting the red car in the vicinity of where the shooting had occurred. Sergeant Barz testified that his statement was the truth because he had viewed the pod camera.

Sergeant Barz testified that he conducted a physical lineup, in which the surviving victim, Roberts, positively identified defendant. Sergeant Barz explained that he conducted a lineup for Roberts to view because Roberts only knew defendant by his nickname "Dee." Sergeant Barz testified that he explained to defendant that the State's Attorney's office would review the case and determine what charges would be filed. Sergeant Barz testified that defendant asked the sergeant to tell him what other people were saying, but the sergeant refused to do so. Sergeant Barz testified that shortly thereafter, defendant made a statement in which he implicated himself in the shooting. Sergeant Barz testified that defendant's statement was very

specific and referred to the surviving victim by his nickname.

Sergeant Barz testified that the lights were turned off in the interview room and defendant was allowed to sleep. Sergeant Barz testified that he never told defendant that he could go home if he made a statement. Defendant had informed the sergeant that he dropped out of high school as a sophomore, and was in a GED program. Sergeant Barz testified that defendant never exhibited an inability to understand plain English. Sergeant Barz also testified that defendant never asked and the sergeant never lied about defendant being videotaped during the interview.

The parties agreed to introduce the videotape of defendant while he was in police custody into evidence. The transcript of defendant's videotaped statement includes the following conversation, in relevant part, between Sergeant Barz and defendant:

"SERGEANT BARZ: Okay, okay, do you know what your, your rights are? I'm gonna read them to you, okay. Okay - and this is just, everyone gets these rights, okay. And basically it[']s just before you have any questions it's our duty to advi[s]e you of your rights. You have the right to remain silent, do you know what that means?

DEFENDANT: (Possibly indicating 'no')

SERGEANT BARZ: Okay, the right to remain silent means that - and I'll explain everything to you. Anything you can say may be used against you in a court or other proceeding, meaning if you give a statement it could be used against you. Do you understand that?

DEFENDANT: (Inaudible, possibly 'uh huh')

SERGEANT BARZ: Do you understand you have a right to talk to a lawyer before we ask questions and you have the right to have him or her present during the questioning if I were to talk to you, okay. If you cannot afford one, otherwise obtain a lawyer and you want one a lawyer will be appointed to you. Do you understand that?

DEFENDANT: (Inaudible, possibly 'uh huh').

SERGEANT BARZ: Do you - if you decide to answer questions now and you want to stop you can stop at any time, okay. And you have the right, you have the right to waive - you may waive the right to advice of counsel and your right to remain silent, you may answer any questions and make a statement without consulting with an attorney if you so desire. And do, do you understand these?

DEFENDANT: What, what was the last one?

SERGEANT BARZ: Okay. You can waive - you don't have to have an attorney present to make - to talk to me right now, okay. Basically that's what it is. So basically you have the right to remain silent, you have the right to an attorney and if you do talk - if you want to make a statement or you want to talk with me and as to why you're here, you can stop at any time and then ask for an attorney, okay? Do you understand those rights? How old are you?

DEFENDANT: 17.

\* \* \*

DEFENDANT: I can't get no phone call?

SERGEANT BARZ: Who do you want to call?

DEFENDANT: My auntie, my guardian.

* * *

SERGEANT BARZ: Okay, you're 17. That means that you are an adult, okay.

DEFENDANT: But I [sic] supposed to get a phone call.

SERGEANT BARZ: You'll, you'll get an opportunity to call your aunt at a reasonable time, okay. But right not you -

DEFENDANT: I can't - I ain't gonna be able to use no pay phone.

SERGEANT BARZ: You can use our phone, you can use my cell phone. I can care less about a pay phone. My point is this, we gotta do these lineups. What do you want to call your auntie for? Tell her you're here.

DEFENDANT: Yeah. So I can talk to her.

SERGEANT BARZ: About what?

DEFENDANT: About why I'm here.

SERGEANT BARZ: I told you why you're here.

DEFENDANT: I'm gonna try to get me a lawyer.

SERGEANT BARZ: Do you want a lawyer?

DEFENDANT: I'm just gonna see if she got the money for it first.

SERGEANT BARZ: What did I tell you when I read you your rights? Money has nothing to do with what - whether you want a lawyer. Do you understand that? Remember when I read you those rights, went through those rights? You have a right to an attorney, you know.

DEFENDANT: But I don't -

SERGEANT BARZ: Can't afford one, one will be appointed to you.

DEFENDANT: I don't want one that, that you all gonna get me.

SERGEANT BARZ: I'm not gonna get you anything. You're, you're gonna get -

DEFENDANT: Whoever the judge gonna get me.

SERGEANT BARZ: Well, that is something that I can't - you know - if you want an attorney - do you want an attorney, yes or no? It's a simple question, it's either yes or no. Now you're indicating to me that you want - you'll call your auntie for an attorney. If you want an attorney, we - you can call your aunt, okay. [Is] that what you're telling us? You don't want to talk to us, you want, you want, you want an attorney?

DEFENDANT: I'm trying to get my auntie to see if she got some money for me [sic] a lawyer.

SERGEANT BARZ: Okay. That's not what I'm asking you. I understand that you're asking your aunt. I need to know and it's very important though, that you - do you want an attorney, a lawyer, yes or no? It's yes or no.

DEFENDANT: But if I say yeah then I call and when say she don't got the money -

SERGEANT BARZ: Well. If you say yes, then we're done talking. We're done talking.

DEFENDANT: And then when I'm gonna get my phone call?

SERGEANT BARZ: You're gonna get your phone call probably pretty soon.."

Following arguments, the circuit court denied defendant's motion to suppress his statement. In doing so, the circuit court found that defendant was advised of his Miranda rights and indicated his understanding of those rights. The court found that defendant's comment to

Sergeant Barz that he wanted to talk to his aunt about whether or not the family could get him a lawyer was equivocal. The court determined that the police went beyond what was required by attempting to contact two of defendant's aunts. The court explained that it reviewed the videotape from the entire time that defendant was in custody and noted that "the vast majority of time that [defendant] is there [he] was either laying on the floor asleep, sitting on the bench, laying on the bench and unhandcuffed at various times." The court held that no coercion occurred with respect to defendant's offering to provide a statement in exchange for Shawn being released from the police station. The court explained that the police officers opened the door so that defendant could see Shawn at the police station, but the officers did not tell defendant that unless he confessed to the shootings Shawn would remain at the police station. Rather, the court noted that the officers did not let Shawn go home at the time because Shawn was not supporting defendant's alibi. The court concluded that a knowing, intelligent waiver of defendant's rights was given, and thus, the court found no legal basis to suppress defendant's statement or the videotape in this case.

Prior to trial, defendant also filed a motion to admit expert testimony on the issues of police interrogation techniques and false confessions. Specifically, defendant wished to call Dr. Richard Leo, a professor of law at the University of San Francisco, who authored numerous studies on the issues. Dr. Leo has a Ph.D. in jurisprudence and social policy. Defendant argued that Dr. Leo's specialized knowledge would assist the jury in determining whether or not defendant's confession was false. Dr. Leo's proffered testimony included an explanation that factors including defendant's low IQ and the interrogation techniques used by police in this case created a risk of a false confession. Following a hearing, the circuit court denied defendant's

motion and held that the jury could determine the weight to give defendant's statement and whether or not defendant's confession was false.

Along those same lines, defendant also requested to *voire dire* potential jurors about their attitudes regarding false confessions, including whether or not they believed that false confessions were possible. The circuit court denied defendant's request and noted that jurors would be asked if they understood that they have to follow the law, including the weight, if any, to give to defendant's statement.

### B. Trial Testimony

At trial, Kevin "Soul" Roberts testified that in December of 2005, he lived in a building located at Washington Boulevard and Parkside Avenue, in Chicago. Roberts testified that on December 12, 2005, he worked at his job as a frame builder for a cabinet company from 7 a.m. until 3 p.m. Roberts testified that he did not get into an altercation with defendant or chase defendant with a gun that day.

At about 4 p.m., Roberts testified that he returned home from work and was on the corner of Washington Boulevard and Parkside Avenue talking to his friend Arthur Levison about getting a job for Levison at the cabinet company. Roberts testified that Hector Flores came out of the building and joined their conversation. Shortly thereafter, Roberts saw a man approaching him who was dressed all in black and wearing a mask covering his nose and chin. The man was about five feet away when Roberts observed the outline of a gun in his coat. Roberts recognized the man as "Dee," which was defendant's nickname, from the neighborhood. Roberts testified that defendant walked up to within three feet of him, pulled out the gun, and fired the gun at Roberts and Levison. Roberts testified that defendant did not say anything.

After being shot in the abdomen, Roberts ran until he heard Flores call him back. Roberts sat down across the street from where he had been shot and could see Levison on the ground. Flores took off his shirt to apply pressure to Robert's wound. Roberts testified that the janitor from his building came out to help and called an ambulance. Roberts testified that he was agitated and in so much pain that he didn't want to talk to anyone, including police officers at the scene. Roberts testified that he was taken to the hospital where he underwent surgery to repair his colon and small intestine. The day after the shooting, Roberts spoke to police officers at the hospital and told them that Dee shot him and described Dee. Roberts testified that police officers showed him photographs, and Roberts said that Dee resembled an individual named "Tidy Man," but Roberts was sure that "Tidy Man" was not the shooter.

Roberts testified that on December 22, 2005, he called the police and provided information about where Dee could be located. Roberts testified that he was subsequently asked to come to the police station, where he viewed a lineup and identified defendant as the shooter. Roberts acknowledged that he had three prior convictions, including one that occurred while defendant's case was pending. Roberts testified that he did not receive any consideration in his case based on being a witness in the present case.

Marvin Frazier testified that on December 12, 2005, he worked as a janitor in the building located at Washington Boulevard and Parkside Avenue. At about 4 p.m., Frazier heard two gunshots and saw that Roberts, whom he knew as Soul, had been shot, as well as another individual, who was on the ground and appeared to be dead.

Hector Flores testified that on the date in question, he lived at Washington Boulevard and Parkside Avenue. Flores testified that he did not remember where he was at the time of the

shooting. Flores testified that he did not recall seeing the shooting or what he said in his statement to an assistant State's Attorney. Flores did not remember viewing a lineup at the police station or identifying anyone in the lineup as the shooter. Flores testified that he was probably under the influence of drugs or alcohol on the date of the shooting.

Assistant State's Attorney (ASA) James Murphy testified that on December 22, 2005, he took a statement from Flores. ASA Murphy testified that Flores provided a handwritten statement about the shooting, in which Flores stated that he witnessed the shooting. Flores stated that on the date in question, he was about to talk to Roberts and Levison, when he saw a black man dressed in black jeans and wearing a mask from his nose down walk toward him. The unidentified man pulled out a gun and shot Roberts and Levison. Levison had been shot in the head and Roberts had been shot but was running from the scene. After the shooter ran away, Flores stated that he called Roberts back. Flores also stated that he viewed a lineup at the police station and identified defendant as the shooter, but he was not 100% positive. Flores further stated that his statement was made freely and voluntarily and that he was free from the effects of drugs or alcohol.

Sergeant Barz testified consistent with his pretrial testimony about defendant's custody, interrogation, and inculpatory statement. Sergeant Barz testified that he went to the hospital the day after the shooting and learned that Levison died from his wound. Sergeant Barz spoke with Roberts, who identified Dee as the shooter. On December 22, 2005, Sergeant Barz received a call that defendant was in custody and Sergeant Barz interviewed defendant. Sergeant Barz testified that he interviewed defendant consistent with the sergeant's pretrial testimony. Sergeant Barz testified that defendant initially stated that he gave a "hype" five crack cocaine

rocks to shoot Roberts. Sergeant Barz testified at that time he had not told defendant who was shot or that Roberts was involved. After Sergeant Barz told defendant that he did not believe defendant's story, defendant admitted that he shot Roberts. Defendant stated that he shot Roberts because Roberts had chased him earlier that day with a gun and Roberts had previously been involved in the shooting death of defendant's cousin. Sergeant Barz testified that he knew that Roberts could not have chased defendant with a gun earlier on the day of the shooting because the sergeant had confirmed that Roberts had been at work. Sergeant Barz testified that Roberts subsequently viewed a lineup and identified defendant as Dee, the individual who shot him and killed Levison. The State then rested its case.

Chicago police officer Philbin testified for the defense that at about 4 p.m., on December 12, 2005, he went to the scene of the shooting at Washington Boulevard and Parkside Avenue. Officer Philbin saw Roberts sitting on the ground and in pain. Roberts was not able to give Officer Philbin his name. When the officer asked Roberts who shot him and who the other victim was, Roberts responded "No" to each question asked of him.

Angela Sparks Wooden testified that on December 12, 2005, she was married to Shawn Wooden and they lived in Bolingbrook with Shawn's mother, sister, and grandparents. Angela testified that on the date in question, Shawn did not drive her to work because she did not have to work that day. Angela testified that she did not know if defendant was at the house in Bolingbrook on that day.

Dora Wooden, Shawn's mother, testified that in December 2005, defendant spent time at her house in Bolingbrook because he was interested in her daughter. Dora testified that she was not sure if defendant was at her house on December 12, 2005. Dora testified that she left for

-14-

work at about 3 p.m. on the date in question.

Dr. Joan Leska, a licensed clinical psychologist, testified as an expert in forensic and clinical psychology. Dr. Leska testified that on September 27, 2006, she performed IQ testing on defendant. Defendant's IQ was 70, placing him in the second percentile, which is extremely low, in the borderline range of intellectual functioning. Dr. Leska met with defendant one week prior to the IQ testing for about five hours and then on the date of testing for about four hours. Dr. Leska testified that she did not observe anything to indicate that defendant was exaggerating or feigning intellectual impairment.

The parties stipulated that if called to testify, Dr. Michael Kronon would testify that on December 12, 2005, Roberts arrived at the hospital with a gunshot wound to the left side of his abdomen. Dr. Kronon would testify that Roberts was alert, able to respond appropriately to questions, and found to be positive for alcohol use. This means either that Roberts stated he was using alcohol or that he smelled of alcohol. Dr. Kronon would further testify that Roberts was taken into surgery to repair two holes in his colon and damage to the small bowel.

Following closing arguments, the jury found defendant guilty of the first degree murder of Levison and found that defendant personally discharged the firearm that caused Levison's death. The jury also found defendant guilty of the attempted murder of Roberts and aggravated battery with a firearm. The circuit court sentenced defendant to consecutive prison sentences of 25 years for the first degree murder of Levison, 25 years for personally discharging the firearm that caused the victim's death, and 15 years for the attempted murder of Roberts. The circuit court denied defendant's motions for a new trial and to reconsider sentence. Defendant now appeals.

## II. ANALYSIS

### A. Motion to Suppress

Defendant first contends that the circuit court erred when it denied defendant's motion to suppress his statement where defendant did not knowingly waive his right to remain silent; defendant invoked his right to counsel; and the surrounding circumstances show defendant's statement was the result of police coercion.

Review of a circuit court's ruling on a motion to suppress presents both questions of law and fact. People v. Richardson, 234 Ill. 2d 233, 251 (2009); In re Christopher K., 217 Ill. 2d 348, 373 (2005). Findings of fact and credibility determinations made by the circuit court are accorded great deference and will be reversed only if they are against the manifest weight of the evidence. People v. Slater, 228 Ill. 2d 137, 149 (2008). This deferential standard of review is grounded in the reality that the circuit court is in the best position to observe the conduct and demeanor of the parties and witnesses, to assess their credibility, and to give the appropriate weight to the evidence. Slater, 228 Ill. 2d at 151. However, a court reviews *de novo* the ultimate legal question posed by the challenge to the circuit court's ruling on the suppression motion. Slater, 228 Ill. 2d at 149. Further, the reviewing court may consider evidence adduced at trial as well as at the suppression hearing. Slater, 228 Ill. 2d at 149. Where a defendant challenges the admissibility of a confession through a motion to suppress, the State bears the burden of proving the confession was voluntary by a preponderance of the evidence. 725 ILCS 5/114-1(d) (West 2004); Slater, 228 Ill. 2d at 149.

In Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), the United States Supreme Court held that, prior to the start of an interrogation, a person being questioned

1-08-0867

by law enforcement officers must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed," as long as that person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444, 16 L. Ed. 2d at __, 86 S. Ct. at 1612; see also Slater, 228 Ill. 2d at 149. However, the United States Supreme Court has never insisted that Miranda warnings be given in the exact form described in that opinion. Duckworth v. Eagan, 492 U.S. 195, 202, 106 L. Ed. 2d 166, 176, 109 S. Ct. 2875, 2879 (1989). In Miranda itself, the Court stated that "[t]he warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant." Miranda, 384 U.S. at 476, 16 L. Ed.2d at 725, 86 S. Ct. at 1629. The Court has clarified that the inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by Miranda. Duckworth, 492 U.S. at 202, 106 L. Ed. 2d at 176, 109 S. Ct. at 2880. Recently, the Court held that police officers' warnings to a defendant notifying him of his rights to (1) "talk to a lawyer before answering any of our questions," and (2) "use any of [his] rights at any time" satisfied the Miranda requirements. Florida v. Powell, 559 U.S. __, ___, 175 L. Ed. 2d 1009, 1012, 130 S. Ct. 1195, 1204-05 (2010) ("In combination, the two warnings reasonably conveyed [defendant's] right to have an attorney present, not only at the outset of interrogation, but at all times."). The Illinois Supreme Court has also explained that "the holding of [Miranda] does not contemplate a ritualistic recital of meaningless words." People v. Prim, 53 Ill. 2d 62, 67 (1972).

### 1. Waiver of Right to Remain Silent

Defendant first argues that he did not knowingly and voluntarily relinquish his right to

-17-

remain silent where he indicated he did not understand that right and Sergeant Barz never explained the right to remain silent.

" 'It is the burden of the State to show that the accused knowingly and voluntarily waived his right to remain silent before an accused's statement can be admitted into evidence. [Citations.] A waiver may be either express or implied, but waiver will not be implied either from a silent record or from the fact that the defendant made statements.' " People v. Calhoun, 382 Ill. App. 3d 1140, 1148 (2008), quoting People v. Brown, 146 Ill. App. 3d 101, 104-05 (1986).

Recently, the United States Supreme Court held that a defendant's silence or refusal to answer questions from a detective could not be construed as an invocation of his right to remain silent. See Berghuis v. Thompkins, 560 U.S. __, 176 L. Ed. 2d 1098, 130 S. Ct. 2250 (2010). In Berghuis, the defendant was arrested and interrogated in relation to a number of charges arising from a violent shooting incident. The interviewing officers informed the defendant of his Miranda rights before the interrogation commenced. The defendant remained largely silent during the three-hour interrogation. Approximately 2 hours and 45 minutes into the interrogation, a detective asked the defendant "Do you believe in God?" and the defendant responded " 'Yes' as his eyes 'well[ed] up with tears.' " The detective next asked the defendant if he prayed to God to which the defendant replied "Yes." The detective then asked, "Do you pray to God to forgive you for shooting that boy down?" to which the defendant responded "Yes" and "looked away." Berghuis, 560 U.S. at __, 176 L. Ed. 2d at 1107, 130 S. Ct. at 2257. The defendant moved to suppress his confession, arguing that by remaining silent for 2 hours and 45 minutes, he had invoked his fifth amendment right to remain silent, that he had not

1-08-0867

waived that right, and that his inculpatory statements were involuntary. The trial court denied the defendant's motion to dismiss and the defendant appealed. Berghuis, 560 U.S. at __, 176 L. Ed. 2d at 1107, 130 S. Ct. at 2257.

On review, the United States Supreme Court held that if a defendant wishes to invoke the right to remain silent he must unambiguously express that desire. Berghuis, 560 U.S. at __, 176 L. Ed. 2d at 1111, 130 S. Ct. at 2260. Merely remaining silent does not affirmatively invoke the protection against self-incrimination garnered by the Constitution. Berghuis, 560 U.S. at __, 176 L. Ed. 2d at 1111, 130 S. Ct. at 2260. The Court held that the defendant's silence during the interrogation was insufficient to invoke his right to remain silent. The Court explained that the defendant never indicated that he wished to remain silent nor did he request an attorney. There was no indication that questioning in that case involved trickery, deceit, coercion, or promises of a positive end. Berghuis, 560 U.S. at __, 176 L. Ed. 2d at 1111, 130 S. Ct. at 2260.

On the issue of whether the defendant waived his right to remain silent, the Court noted that "[t]he waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " Berghuis, 560 U.S. at __, 176 L. Ed. 2d at 1111, 130 S. Ct. at 2260, quoting Moran v. Burbine, 475 U.S. 412, 421, 89 L. Ed. 2d 410, 421, 106 S. Ct. 1135, 1141 (1986). The Court held that the record showed that the defendant waived his right to remain silent. First, the lack of any contention that the defendant did not understand his rights indicated that the defendant knew what he gave up when he spoke. Second, the defendant's answer to the detective's question about whether the defendant prayed to God for

-19-

forgiveness for shooting the victim was a "course of conduct indicating waiver." Berghuis, 560 U.S. at __, 176 L. Ed. 2d at 1112, 130 S. Ct. at 2263. If the defendant had wanted to remain silent, he could have said nothing in response to the detective's questions or unambiguously invoked his Miranda rights and ended the interrogation. The fact that the defendant made a statement nearly three hours after receiving his Miranda warning did not overcome the fact that he engaged in a course of conduct indicating waiver. Third, there was no evidence that the defendant's statement was coerced. Berghuis, 560 U.S. at __, 176 L. Ed. 2d at 1111-12, 130 S. Ct. at 2262-63.

In the present case, we have watched the video recording of defendant's interrogation and see no reason to disturb the circuit court's ruling that defendant executed a valid waiver of his Miranda rights. The record shows that defendant did not unambiguously invoke his right to remain silent. After Sergeant Barz initially asked defendant, "You have the right to remain silent, do you know what that means?" defendant made a head gesture which might be interpreted as a "no." Sergeant Barz then explained, "Okay, the right to remain silent means that - and I'll explain everything to you. Anything you can say may be used against you in a court or other proceeding, meaning if you give a statement it could be used against you. Do you understand that?" Defendant then indicated that he understood by saying "uh huh." After being read all of his Miranda warnings, defendant asked a question about his right to an attorney, then Sergeant Barz had a conversation with defendant about his right to an attorney. Defendant did not ask any questions about his right to remain silent after indicating that he understood that right. Defendant then responded to Sergeant Barz's questions and actively participated in the interview. Had defendant wished to invoke his right to remain silent, he could have said nothing

in response to the sergeant's questions or unambiguously invoked his <u>Miranda</u> rights, ending the interrogation.

The record also shows that defendant waived his right to remain silent when he knowingly and voluntarily made a statement to the police. First, Sergeant Barz's reading of the <u>Miranda</u> warnings was sufficient to reasonably convey to defendant his rights. <u>Duckworth</u>, 492 U.S. at 202, 106 L. Ed. 2d at 176, 109 S. Ct. at 2880. While defendant asserts that Sergeant Barz's explanation of defendant's <u>Miranda</u> rights "framed them in a way that dismissed their importance," the United States Supreme Court has never insisted that <u>Miranda</u> warnings be given in the exact form described in that opinion. <u>Duckworth</u>, 492 U.S. 195 at 202, 106 L. Ed. 2d at 176, 109 S. Ct. at 2880.

Second, defendant's answers to the sergeant's questions, implicating himself in the shooting, were a "course of conduct indicating waiver" of his right to remain silent. See <u>Berghuis</u>, 560 U.S. at __, 176 L. Ed. 2d at 1114, 130 S. Ct. at 2263. If defendant wanted to invoke his right to remain silent, he could have refused to answer any of the sergeant's questions or unambiguously invoked his <u>Miranda</u> rights. Third, the record does not show that defendant's statement was coerced. Defendant does not claim that police threatened or injured him. The videotaped interview shows that defendant was not questioned continuously during his time in police custody. During brief sessions of questioning, the police officers were courteous to defendant. Defendant was provided with food and drinks, allowed to use the washroom as needed, and permitted to smoke his cigarettes. Defendant was also allowed to sleep and the lights in the interview room were turned off as requested. In these circumstances, defendant knowingly and voluntarily made a statement to police, so he waived his right to remain silent.

## 2. Right to Counsel

Defendant next contends that the record does not support the circuit court's findings that defendant understood his right to counsel. Contrary to defendant's assertion, the videotaped interview shows that Sergeant Barz stated, "Do you understand you have a right to talk to a lawyer before we ask questions and you have the right to have him or her present during questioning if I were to talk to you, okay. If you cannot afford one, otherwise obtain a lawyer and you want one a lawyer will be appointed to you. Do you understand that?" Defendant then indicated he understood and said, "uh huh." Sergeant Barz then explained, "[I]f you decide to answer questions now and you want to stop you can stop at any time, okay. And you have the right, you have the right to waive - you may waive the right to advice of counsel and your right to remain silent, you may answer any questions and make a statement without consulting with an attorney if you so desire. And do, do you understand these?" Defendant responded, "What, what was the last one?" Sergeant Barz then repeated his explanation that defendant could waive his rights to remain silent and to have counsel present. While defendant asked the sergeant to repeat this particular explanation of rights, defendant never indicated that he did not understand his right to counsel. In addition, defendant told the sergeant that he did not want an appointed attorney and asked about calling his aunt to see if she had money to retain private counsel. Thus, defendant exhibited a clear understanding of his right to counsel.

Defendant also contends that the circuit court should have suppressed his inculpatory statement because the police continued to question his despite an unambiguous invocation of his right to counsel.

In <u>Miranda</u>, the United States Supreme Court held that, as a safeguard for the Fifth

Amendment privilege against self-incrimination, an individual subjected to custodial interrogation is entitled to have counsel present during the questioning. In Edwards v. Arizona, 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981), the Court clarified that, "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." Edwards, 451 U.S. at 484, 68 L. Ed. 2d at 386, 101 S. Ct. at 1884-85. Moreover, "an accused, *** having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-85, 68 L. Ed. 2d at 386, 101 S. Ct. at 1885.

As the Court explained in Davis v. United States, 512 U.S. 452, 129 L. Ed. 2d 362, 114 S. Ct. 2350 (1994), the applicability of the rigid prophylactic rule of Edwards requires courts to determine whether the accused " '*actually invoked* his right to counsel.' " (Emphasis in original.) Davis, 512 U.S. at 458, 129 L. Ed. 2d at 371, 114 S. Ct. at 2355, quoting Smith v. Illinois, 469 U.S. 91, 95, 83 L. Ed. 2d 488, 492, 105 S. Ct. 490, 493 (1984). The Court's holding in Davis was followed by the Illinois Supreme Court in People v. Oaks, 169 Ill. 2d 409 (1996), which in turn was followed by the Illinois Supreme Court's holding in In re Christopher K., 217 Ill. 2d 348, 379 (2005). In Oaks, the defendant was asked if he would sign a written statement summarizing his oral statement to the police. The defendant asked the detective, "Should I see a lawyer?" Oaks, 169 Ill. 2d at 452. The detective told the defendant that the decision was his to make, then the detective urged the defendant to give a written statement. Oaks, 169 Ill. 2d at

452-53.  The Illinois Supreme Court held that the defendant's remark was ambiguous and, applying the holding in Davis, concluded: "absent an unambiguous or unequivocal request for counsel, [the detective] had no obligation to stop questioning defendant."  Oaks, 169 Ill. 2d at 453, citing Davis, 512 U.S. at 461, 129 L. Ed. 2d at 373, 114 S. Ct. at 2356.

In Christopher K., the 14-year-old defendant asked the detective interviewing him, "Do I need a lawyer?" immediately after being read his Miranda warnings.  Christopher K., 217 Ill. 2d at 383.  The Illinois Supreme Court affirmed the denial of the defendant's motion to suppress where the defendant's question "was phrased as a request for advice, not as an assertion of a desire to obtain counsel."  Christopher K., 217 Ill. 2d at 383.  The court noted that the actual content of the statement in Christopher K., was " virtually identical to that of the statement we found to be ambiguous in Oaks, 'Should I see a lawyer?' "  Christopher K., 217 Ill. 2d at 383, quoting Oaks, 169 Ill. 2d at 451.

Therefore, to be entitled to the protection of Edwards, " 'the suspect must unambiguously request counsel.' "  People v. Quevedo, 403 Ill. App. 3d 282, 293, quoting Davis, U.S. at 459, 129 L. Ed. 2d at 371, 114 S. Ct. at 2355.  If " 'a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [United States Supreme Court] precedents do not require the cessation of questioning.' "  Quevedo, 403 Ill. App. 3d at 292, quoting Davis, 512 U.S. at 459, 129 L. Ed. 2d at 371, 114 S. Ct. at 2355; see also People v. Krueger, 82 Ill. 2d 305, 311 (1980) ("We do not believe *** that every reference to an attorney, no matter how vague, indecisive or ambiguous, should constitute an invocation of the right to counsel"); People v. Schuning, 399 Ill. App. 3d 1073, 1082 (2010) ("The defendant need not

articulate his desire in the manner of a Harvard linguist, but he must articulate his desire in a clear enough manner that a reasonable officer in the circumstances would understand the statement to be a request for an attorney").

"To avoid difficulties of proof and to provide guidance to officers conducting interrogations," the determination of whether an accused actually invoked the right to counsel under Edwards and Miranda "is an objective inquiry." Davis, 512 U.S. at 458-59, 129 L. Ed. 2d at 371, 114 S. Ct. at 2355. Applying this objective standard, we conclude that defendant did not unambiguously invoke his right to counsel.

The record shows that when Detective Barz asked defendant why he wanted to call his aunt, defendant responed, "I'm gonna try to get me a lawyer." When Detective Barz asked him, "Do you want a lawyer?" defendant then responded, "I'm just gonna see if she got money for it first." Detective Barz then reminded defendant of his right to an attorney and that, if he could not afford an attorney, one would be appointed to him. Defendant specifically rejected an appointed attorney by stating, "I don't want one that, that you all gonna get me." Defendant then stated, "I'm trying to get my auntie to see if she got some money for me [sic] a lawyer." In light of these circumstances, a reasonable police officer could have interpreted these statements as defendant inquiring about the ability of his family to retain a private attorney rather than an unambiguous request for counsel. In fact, defendant declined to have counsel appointed to him and reiterated that he merely wanted to call his aunt to see if she had money to retain private counsel.

Defendant relies on Smith, 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490, in support of his argument that he unambiguously invoked his right to counsel. However, Smith is

distinguishable from the present case. In Smith, the defendant was arrested and taken to an interrogation room. The officer questioning the defendant gave him the Miranda warnings, informing him that " '[y]ou have a right to consult with a lawyer and to have a lawyer present with you when you're being questioned. Do you understand that?' " Smith, 469 U.S. at 93. 83 L. Ed. 2d at 492, 105 S. Ct. at 491. The defendant responded, " 'Uh, yeah, I'd like to do that.' " Smith, 469 U.S. at 93, 83 L. Ed. 2d at 491, 105 S. Ct. at 492 (Emphasis omitted.). Instead of terminating the questioning at that point, the officer finished reading the Miranda rights aloud, then asked the defendant, " 'Do you wish to talk to me at this time without a lawyer being present?' " Smith, 469 U.S. at 93, 83 L. Ed. 2d at 491, 105 S. Ct. at 492. The defendant answered, " 'Yeah and no, uh, I don't know what's what, really.' " (Emphasis omitted.) Smith, 469 U.S. at 93, 83 L. Ed. 2d at 492, 105 S. Ct. at 491. The defendant then agreed to answer questions without having counsel present. The Supreme Court held that the defendant's initial response constituted an unequivocal request for counsel and that, under the bright-line rule stated in Edwards, "all questioning must cease after an accused requests counsel." (Emphasis omitted.) Smith, 469 U.S. at 98, 83 L. Ed. 2d at 495, 105 S. Ct. at 494. In Smith, the defendant invoked his right to counsel by making an unequivocal, unambiguous request, even though the request was made before the officer finished reading the Miranda warnings. Here, defendant did not make an unequivocal, unambiguous request for counsel at any time. Defendant's equivocal questions and statements about making a phone call to his aunt to see if she had money to retain private counsel do not qualify as a request for counsel under Edwards, as interpreted by the Court in Davis and the Illinois Supreme Court in Oaks and Christopher K.

3. Voluntariness of Defendant's Statement

1-08-0867

Defendant lastly claims that the circuit court should have granted his motion to suppress because his statement was the product of police coercion.

The legal inquiry for the admission of a confession in evidence is usually framed as whether the defendant's confession was voluntary. Richardson, 234 Ill. 2d at 252. The test for voluntariness is " 'whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed.' " Richardson, 234 Ill. 2d at 253, quoting Slater, 228 Ill. 2d at 160. In making this determination, we consider the totality of the circumstances surrounding the statement, including: (1) the defendant's age, intelligence, education, experience, and physical condition at the time of the detention and interrogation; (2) the duration of the interrogation; (3) the presence of Miranda warnings; (4) the presence of any physical or mental abuse; and (5) the legality and duration of the detention. Richardson, 234 Ill. 2d at 253, citing Slater, 228 Ill. 2d at 160.

In considering the first factor, defendant argues that his statement was not provided voluntarily where he was 17 years of age, read at a second-grade level, and had an IQ of 70, which placed him in the extremely low or borderline range of intellectual functioning. However, a review of the videotaped statement shows that defendant spoke fluently with the officers in a conversational manner, engaged the officers in conversation, and provided details about the shooting, including his motive. There were no outward indications that defendant had a disability and there was no evidence that defendant's intellectual limitations interfered with his ability to communicate with police officers. Thus, we find this factor does not support the conclusion that defendant's confession was involuntary.

1-08-0867

In examining the legality and duration of the detention and questioning, these considerations do not support finding defendant's confession was involuntary. Defendant was arrested at 8:50 a.m., on December 22, 2005. Defendant was initially brought to the 15th District police station, then transferred at around noon to the Area 5 police station. The investigating officers first questioned defendant at about 2:40 p.m. and defendant provided a statement at about 6:47 p.m. The videotaped interview shows that defendant was not questioned continuously during this time. Rather, the police officers had about eight brief sessions in which they asked defendant questions. The police officers were courteous to defendant and defendant was provided with food and drinks, allowed to use the washroom as needed, and permitted to smoke his cigarettes. Defendant was also allowed to sleep and the lights in the interview room were turned off as requested.

Next, as previously explained, defendant was provided with Miranda warnings and showed that he understood these warnings. After defendant indicated that he wanted to call his aunt, the police officers attempted to call her on the phone and then sent a police car to the aunt's residence.

Defendant argues that his statement was the result of coercion because the detectives failed to tell defendant that he was being videotaped, and detectives commented that they would not "write any paperwork," that defendant would not "be judged," and that it could "make a difference" if defendant had been mad at the time of the shooting. As a result, defendant asserts that he had no reason to believe that his statements would be memorialized in any way and defendant was tricked into confessing by being told that he would not be held accountable.

Contrary to defendant's contention, the record shows that the detectives made clear to

-28-

defendant that the State's Attorney's Office would review his case and make decisions regarding charges. The videotaped interview shows the following exchange between the detectives and defendant:

"SERGEANT BARZ: *** What happened that day?

DEFENDANT: Yah. How, how I know you all gonna write the paperwork right?

SERGEANT BARZ: We won't write any paperwork

DEFENDANT: So what gonna happen?

SERGEANT BARZ: What's gonna happen? A state's attorney is gonna come in and review it.

DETECTIVE NORADIN: We're gonna tell them exactly what you told us.

SERGEANT BARZ: Yeah, there won't be no paper. And they make the decision.

DETECTIVE NORADIN: It's not our decision to make. *** [A]ll our function is, is to gather the facts and that's what we're trying to do is gather the facts. We have one version, one side of the story. We just need to know what your side of [the] story is."

Thus, the record shows that while the police officers may have made comments that they would not personally judge defendant and that they were not angry at defendant, the officers made clear that the decision regarding charging defendant would remain up to the State's Attorney's office. In addition, defendant cites no case law to support his argument that the police officers were required to disclose that the statement was being videotaped.

Finally, we find that defendant was not the subject of any physical or mental abuse by his questioners, including the existence of threats or promises. Defendant asserts that he was coerced where Sergeant Barz deceived him by telling him that a pod camera recorded him in the

area at the time of the shooting. However, Sergeant Barz testified at the hearing on defendant's

motion to suppress that on the date of the shooting, a police camera recorded a red vehicle and a

black male dressed like the shooter exiting the vehicle near the scene of the shooting. During

defendant's interview, he told Sergeant Barz that on the date in question, he was with Shawn,

who owns a red vehicle, in Bolingbrook. After Shawn did not corroborate defendant's alibi,

Sergeant Barz confronted defendant with this information. The record does not support

defendant's contention that his confession was the result of the intentional use of deceit.

Defendant further argues that he was coerced where Sergeant Barz promised him that, if

he confessed, the detectives would let Shawn go home. The record does not support defendant's

contention. Rather, the videotaped statement shows that defendant himself offered to provide a

statement if the police officers let Shawn go home. In response, Sergeant Barz repeatedly

declined defendant's offer and explained that the police officers and assistant State's Attorney

still needed to talk to Shawn about the shooting. Specifically, the record shows the following

colloquy between defendant and Sergeant Barz:

"DEFENDANT: If you all let, if you all let him go, I'll talk to you all.

SERGEANT BARZ: *** We can't play these games where you tell us

do this and I'll talk. I can't do that any more. You talk about what happened and you say

what happened. If Shawn had nothing to do with it, he's gonna get out of here. That's

no problem. We don't care about Shawn, okay. But I cannot continue nor will my boss

allow me to continue you dictating what we do, okay. So talk about what happened and

let's get it over with and then Shawn will be gone but not a minute before then."

Therefore, the record does not support defendant's claim that his statement was the product of

police coercion based on promises to let Shawn go home.

After examining the particular circumstances surrounding defendant's questioning and the relevant factors, we conclude that defendant's statement was voluntary and not the product of police coercion.

### B.  Expert Testimony

Defendant next contends that the circuit court improperly excluded Dr. Leo's testimony that factors including defendant's low IQ and interrogation techniques used in this case, such as the detectives challenging defendant's denials and detaining defendant for a significant length of time, created a risk of a false confession.

Even though the circuit court here denied defendant's motion to suppress his statement, finding it voluntary, defendant still had the right to present evidence relevant to the credibility or weight of the confession.  People v. Wood, 341 Ill. App. 3d 599, 608 (2003), citing People v. Gilliam, 172 Ill. 2d 484, 512-13 (1996).  However, " 'the admission of evidence remains within the [sound] discretion of the trial court and will not be reversed absent an abuse of discretion.' " People v. Bennett, 376 Ill. App. 3d 554, 571 (2007), quoting Wood, 341 Ill. App. 3d at 608; also see People v. Nelson, 235 Ill. 2d 386, 430-31 (2009) ("It is within the court's discretion to decide whether an expert witness is qualified to testify in a particular subject area and whether the proffered testimony is relevant.")  Expert testimony is proper where such testimony is needed to explain matters beyond the common knowledge of ordinary citizens, and where such testimony will aid the fact finder in reaching its conclusion.  Bennett, 376 Ill. App. 3d at 571.

Here, the circuit court held that Dr. Leo's proffered testimony regarding his assessment of interrogation techniques and the likelihood of a false confession in this case was not beyond

the common knowledge of lay persons and would not aid the jury in reaching its conclusion. The circuit court permitted defendant to comment upon the evidence during opening statements, trial and closing arguments, and the jury was able to view the videotape of the police interrogation. The jury also heard testimony from the police officer who questioned defendant and testimony about defendant's educational background and intellectual level. The circuit court determined that the jury could decide the weight to give defendant's statement and whether or not defendant's confession was false. Defendant had not shown an abuse of discretion in excluding the expert testimony.

In Bennett, this court held that it was not an abuse of discretion for the trial court to deny the defendant's request to present expert testimony that he was susceptible to police interrogations and suggestions based on his intellectual abilities. Bennett, 376 Ill. App. 3d at 572. This court noted that the defendant's claim was not beyond the understanding of ordinary citizens, nor a concept difficult to understand. Bennett, 376 Ill. App. 3d at 572. In so holding, this court relied on its previous determination in Wood, wherein we held that the defendant was not entitled to present expert testimony that he was easily coerced and susceptible to intimidation in order to support his claim that his confession to police was involuntary. Bennett, 376 Ill. App. 3d at 571-72, citing Wood, 341 Ill. App.3d at 608-09. In Wood, this court noted that the defendant's claim was not beyond the understanding of ordinary citizens and that the trier of fact could have reached the same conclusion as the expert based on the defendant's testimony. Wood, 341 Ill. App. 3d at 608.

In Bennett, this court also relied on Gilliam, where the Illinois Supreme Court similarly held that the trial court properly limited expert testimony that the defendant's desire to protect

1-08-0867

his family made him especially susceptible to police pressures and created a psychological compulsion to confess. Bennett, 376 Ill. App. 3d at 572, citing Gilliam, 172 Ill. 2d at 512-13. In Gilliam, our supreme court held that whether the defendant falsely confessed to protect his family was not a concept beyond the understanding of ordinary citizens and was not difficult to understand or explain. The court also noted that the defendant was not precluded from challenging the credibility of his confession and the jury could have reached the same conclusion as the expert based on the testimony of the other witnesses. Gilliam, 172 Ill. 2d at 513.

Similarly, Dr. Leo's testimony that defendant's low IQ and the police interrogation techniques used in this case could have resulted in a false confession was not beyond the understanding of ordinary citizens, nor a concept difficult to understand. In addition, the circuit court did not prevent defendant from challenging the credibility and weight of his confession throughout defendant's trial. Further, the jury received testimony in this case regarding defendant's education, age, and intellectual performance. This included psychologist Dr. Joan Leska's testimony that defendant had an IQ of 70, placing him in the second percentile, which is extremely low, in the borderline range of intellectual functioning. The jury also heard testimony regarding the conditions of defendant's interrogation, the length of time defendant was interrogated, the receipt and waiver of Miranda rights, and the content of the police questions and defendant's statements. The jury viewed defendant's videotaped statement and could assess the format in which the questions were presented and answers were provided. It was reasonable for the circuit court to conclude that the jury could decide the issue of the reliability of defendant's statement and could have reached the same conclusion as Dr. Leo based on the testimony of other witnesses about defendant's intellectual level and the evidence of defendant's

-33-

1-08-0867

interrogation. Therefore, we cannot say that the circuit court abused its discretion in excluding Dr. Leo's testimony.

We note that following oral arguments in this case, defendant filed a motion to cite our supreme court's recent decision in People v. Becker, No. 108986 (December 2, 2010). We find defendant's reliance on Becker in support of his argument that the circuit court abused its discretion by excluding the testimony of Dr. Leo to be misplaced. In Becker, our supreme court held that the trial court properly excluded expert testimony regarding the reliability and credibility of statements made by the child victim in that case. Becker, slip op. at 16. Our supreme court analogized the case to Gilliam and held that the proffered expert testimony "that this young child, like any young child, might be influenced by suggestive questioning and improper investigative techniques, is not a matter beyond the ken of the average juror." Becker, slip op. at 16. The court explained that the defendant was not precluded from challenging the credibility of the victim's statements by apprising the jury of the circumstances surrounding the statements through other witnesses on direct and cross-examination. The court further noted that defense counsel in fact did challenge the credibility of the victim's statements and discussed, in laymen's terms, the very principles that the expert witness would have testified to. Becker, slip op. at 17. The same is true here. As previously discussed, Dr. Leo's testimony that defendant's low IQ and the police interrogation techniques used in this case could have resulted in a false confession was within the ken of the average juror. In addition, defendant had the opportunity to challenge the credibility and weight of his confession through other witnesses and the presentation of his videotaped statement.

We also find defendant's reliance on People v. Cardamone, 381 Ill. App. 3d 462 (2008),

-34-

unconvincing. In Cardamone, the Second District of this court held that the circuit court erred in summarily excluding the expert testimony offered by the defendant, a gymnastics coach who was charged with 8 counts of predatory sexual assault of a child and 18 counts of aggravated criminal sexual abuse against 14 of his gymnasts. Cardamone, 381 Ill. App. 3d at 464. The court found that the defendant's psychiatric experts' testimony was relevant to whether investigative techniques and circumstances created distorted memories or misconceptions. The court explained that since there was no physical evidence or third-party eyewitnesses, the testimony may have been helpful to the jury in deciding the issues. Cardamone, 381 Ill. App. 3d at 507. The court also found that the experts' proposed testimony was neither within the common knowledge of an average juror nor could it have been addressed through cross-examination. The court explained, "It is highly doubtful that psychological concepts such as reconstructive retrieval, infantile amnesia, mass suggestion, and even forensic interviewing techniques for child victims of sexual abuse are within common knowledge. *** In our opinion, cross-examination was not a substitute for the experts' testimony, because it merely elicited facts without helping the jury understand how those facts impacted the reliability of memory and, therefore, the complainants' statements." Cardamone, 381 Ill. App. 3d at 506. The court held that the circuit court erred by summarily excluding the experts' entire testimony because the court should have separately assessed the testimony on each issue and weighed its probative value against its prejudicial effect. However, in remanding the case for reconsideration of the experts' testimony, the court stated "we express no opinion regarding which, if any, portions of the testimony are admissible." Cardamone, 381 Ill. App. 3d at 507.

Unlike Cardamone, here, the expert testimony was not offered to explain how

investigative techniques and circumstances could create distorted memories and misconceptions in child sexual assault cases. Also, unlike Cardamone, there was physical evidence and third-party eyewitness' testimony implicating defendant. Moreover, as previously explained, the expert's proposed testimony in this case regarding false confessions was within the common knowledge of an average juror and could be addressed through cross-examination.

We further find defendant's reliance on United States v. Hall, 93 F.3d 1337 (7th Cir. 1996), unconvincing. In Hall, the Seventh Circuit reversed because no hearing had been conducted, under the Federal Rules of Evidence, to determine whether the testimony of an expert on false confessions was admissible. The expert testimony regarding the defendant's alleged false confession was based on a diagnosed personality disorder. Hall, 93 F.3d at 1341. The court held that the expert testimony on this issue was relevant because "juries are unlikely to know that social scientists and psychologists have identified a personality disorder that will cause individuals to make false confessions." Hall, 93 F.3d at 1345. Here, defendant was not diagnosed with a personality disorder. Dr. Leo, whose doctorate is in jurisprudence and social policy, merely opined that defendant was susceptible to interrogations based on the techniques used and defendant's intellectual limitations. We find no abuse of discretion where the circuit court could conclude that this testimony would not aid the jury.

## C. *Voir Dire*

Defendant next contends that the circuit court erred in denying his request to ask prospective jurors about their attitudes on "false confessions." Defendant argues that the circuit court should have allowed him to ask the following questions:

"Do you believe it is possible that someone might confess to something he did not

do?

If you were to hear evidence that [defendant] made a confession or statement related to this case, would you be able to consider whether it is a true or false confession or statement based on all the circumstances?

Do you have any feeling or viewpoint concerning the defense of a false confession? If so, what?"

Defendant maintains that false confessions are controversial and the proposed questions were necessary to determine whether potential jurors had the state of mind to serve at defendant's trial. The State maintains that the circuit court properly denied defendant's request where the questions would have improperly indoctrinated the jury on his defense.

When reviewing the circuit court's denial of a party's request to question prospective jurors on a particular viewpoint, our standard of review is whether the court abused its discretion. People v. Reeves, 385 Ill. App. 3d 716, 729-30 (2008). *Voir Dire* in a criminal trial is governed by Supreme Court Rule 431 (177 Ill. 2d R. 431) (parties are allowed to supplement the trial court's examination "by such direct inquiry as the court deems proper"). The purpose of *voir dire* is to select an impartial jury, not to indoctrinate a jury or choose a jury with a predisposition. Reeves, 385 Ill. App. 3d at 730. A circuit court properly refuses questions designed to educate the jurors on the defendant's theory of defense and ensure the selected jurors are receptive to that defense. Reeves, 385 Ill. App. 3d at 730. In general, a proposed *voir dire* question addressing an affirmative defense should be excluded. Reeves, 385 Ill. App. 3d at 730.

In Reeves, the defendant, as in the present case, requested to ask potential jurors about their attitudes on "false confessions." The Reeves defendant also maintained that false

-37-

confessions were controversial and that his proposed question was necessary to determine whether prospective jurors could be fair to a defendant who claimed he gave a false confession. The defendant specifically argued that the circuit court should not have sustained the State's objection to defense counsel's question: " 'You may hear evidence during the course of the trial of a false statement. *** Would you be able to evaluate [defendant's] testimony at the same level as the police officer who is taking the opposition position?' " Reeves, 385 Ill. App. 3d at 729. This court held that the defendant's question was defective because it would have improperly indoctrinated the prospective jurors to defendant's affirmative defense. Reeves, 385 Ill. App. 3d at 730. This court noted that the circuit court's rationale for refusing the question was not indoctrination but, rather, was based on a finding that the question would have required the prospective juror to accept as true that defendant had given a false statement. In that case, the jury was not going to hear evidence that the statement was false but that it was coerced. This court explained, "After hearing evidence that the statement was coerced, the jury might or might not have decided that the statement was false." Reeves, 385 Ill. App. 3d at 730. Thus, this court held, "The trial court properly refused the question, as phrased, because it would have required the prospective juror to accept as an ultimate fact that defendant's statement was false before hearing the evidence." Reeves, 385 Ill. App. 3d at 730.

In the present case, defendant argues that unlike Reeves, the wording of his questions did not require potential jurors to assume that defendant's statement was false before hearing the evidence. However, we find that, similar to Reeves, the questions here would have improperly indoctrinated the potential jurors to defendant's affirmative defense. The circuit court determined that asking the prospective jurors whether they could follow the law would be

sufficient. We find no abuse of discretion by the circuit court in finding that it would be inappropriate to specifically question the prospective jurors regarding defendant's affirmative defense.

### D. IPI Criminal 4th No. 3.15

Defendant next claims that the circuit court erred by using a certain portion of a pattern jury instruction.

A reviewing court will reverse a circuit court's determination about what jury instructions to give only if the trial court abused its discretion. People v. Rodriguez, 387 Ill. App. 3d 812, 821 (2008). When deciding whether a circuit court abused its discretion, a reviewing court will examine the jury instructions in their entirety to determine whether they fairly, fully and comprehensively informed the jury of the relevant law. Rodriguez, 387 Ill. App. 3d at 821. An abuse of discretion occurs only where the circuit court's ruling is " 'arbitrary, fanciful, or unreasonable, or where no reasonable person could take the view adopted by the trial court.' " Rodriguez, 387 Ill. App. 3d at 821, quoting People v. Purcell, 364 Ill. App. 3d 283, 293 (2006). Further, a reviewing court will not ordinarily reverse a circuit court, even if the circuit court gave faulty instructions, unless the instructions clearly misled the jury and resulted in prejudice to the defendant. Rodriquez, 387 Ill. App. 3d at 821.

The version of IPI Criminal No. 3.15 that was in effect at the time of defendant's trial, in December of 2007,[1] stated:

---

[1] In 2003, the IPI Committee changed this instruction to remove the bracketed "or"s between the factors. People v. Piatkowski, 225 Ill. 2d 551, 561 n.1 (2007), citing IPI Criminal

"When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:

[1] The opportunity the witnesses had to view the offender at the time of the offense.

[2] The witness's degree of attention at the time of the offense.

[3] The witness's earlier description of the offender.

[4] The level of certainty shown by the witness when confronting the defendant.

[5] The length of time between the offense and the identification confrontation."  IPI Criminal 4th No. 3.15 (Supp. 2003).

On appeal, defendant objects to the circuit court's decision to give the fourth factor: the certainty shown by the witness.

Supreme court rules require a circuit court to use those Illinois Pattern Jury Instructions that are both (1) applicable to the facts and law of the case; and (2) correct statements of law. Specifically, Supreme Court Rule 451(a) states unequivocally that a circuit court "shall" use "the Illinois Pattern Jury Instructions, Criminal 4th ed. 2000)" when it is "applicable in a criminal case, giving due consideration to the facts and the governing law *** unless the court determines that it does not accurately state the law." 210 Ill. 2d R. 451(a); Rodriguez, 387 Ill. App. 3d at 822. The use of the word "shall" in the rule makes clear that the use of the IPI is not optional,

_____

4th No. 3.15 (Supp. 2003). Our supreme court has ruled that giving IPI Criminal 4th No. 3.15 with the "or"s between the factors is error. People v. Herron, 215 Ill. 2d 167, 191 (2005).

1-08-0867

but mandatory. Ultsch v. Illinois Municipal Retirement Fund, 226 Ill. 2d 169, 179 (2007).

Although pattern instructions are not themselves law and are open to challenge if they are

inaccurate statements of the law, the instructions are mandatory, if applicable and accurate.

Rodriguez, 387 Ill. App. 3d at 822.

Defendant does not argue that IPI Criminal 4th No. 3.15 misstated Illinois law. Our

supreme court has held that the five factors listed in the instruction are an accurate statement of

the law "for assessing the reliability of identification testimony." Piatowski, 225 Ill. 2d at 567.

These factors are commonly known as the Biggers factors and were taken from a United States

Supreme Court case of the same name. Piatowski, 225 Ill. 2d at 567, citing Neil v. Biggers, 409

U.S. 188, 199-200, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382 (1972). These factors are

undisputedly the law in Illinois for the purpose of assessing the reliability of an identification.

Piatowski, 225 Ill. 2d at 567.

Instead of arguing illegality, defendant argues that IPI Criminal 4th No. 3.15 was

inapplicable where Roberts had known defendant for 10 years, yet failed to identify defendant as

the shooter until the day after the shooting. However, the IPI committee instructs the circuit

court to "[g]ive this instruction when identification is an issue." IPI Criminal 4th No. 3.15,

Committee Note, at 106. There is no dispute that identification was an issue. Moreover, the

evidence in this case showed that Roberts was in a tremendous amount of pain after being shot in

the abdomen and then was taken to the hospital where he underwent surgery. This evidence

provides an explanation for Roberts' initial failure to identify the shooter immediately following

the shooting.

Defendant also argues that IPI Criminal 4th No. 3.15 is out of date, in light of social

-41-

science research that "has demonstrated that the level of certainty is unrelated to the accuracy of eyewitness identifications." This court considered the same argument in Rodriguez, 387 Ill. App. 3d at 823. In Rodriguez, the defendant relied on this court's decision in People v. Allen, 376 Ill. App. 3d 511 (2007). In Allen, this court stated that it was a "commonly accepted misconception[]" that a witness's level of certainty was well correlated to the accuracy of his or her identification. Allen, 376 Ill. App. 3d at 524. This court held that a defendant had a right to present eyewitness expert testimony challenging this "misconception," so long as the trial court found that the testimony would assist the jury. Allen, 376 Ill. App. 3d at 524-25. This court held that a defendant could challenge this factor, without identifying it as one of the Biggers factors. Allen, 376 Ill. App. 3d at 524-25. This court reversed the defendant's conviction because the circuit court refused the proposed testimony of an eyewitness identification expert without first conducting "a meaningful inquiry" into its relevance. Allen, 376 Ill. App. 3d at 526.

The Rodriguez defendant attempted to build on Allen to "knock out this Biggers factor, not just for his case but for all time." Rodriguez, 387 Ill. App. 3d at 824. However, this court explained that, on the other hand, there is a long line of cases holding that all five of the Biggers factors are required when assessing the reliability of an identification. Rodriguez, 387 Ill. App. 3d at 824, citing People v. Jackson, 348 Ill. App. 3d 719, 739 (2004). This court in Rodriguez reconciled Allen with the prior line of cases by explaining:

> "Although all five factors are generally required, the IPI permits a trial court to
> omit a particular factor, if such an omission is warranted by the evidence in that
> individual case. When the IPI committee added IPI Criminal 4th No. 3.15 to its
> pattern instructions, the committee stated that the trial judge should give only

those 'numbered paragraphs that are supported by the evidence.' IPI Criminal 4th No. 3.15, Committee Note, at 107. In 2003, the IPI committee added a paragraph to its notes to make crystal clear that the trial court could omit a factor, based on the evidence presented in the case. The 2003 notes stated: ' "The jury should be instructed on only the factors with any support in the evidence. Other factors should be omitted." ' [Citation.]" Rodriguez, 387 Ill. App. 3d at 824, quoting People v. Herron, 215 Ill. 2d 167, 191 (2005), quoting IPI Criminal 4th No. 3.15, Committee Note, at 2 (Supp. 2003).

Therefore, this court held that a circuit court may omit one of the Biggers factors listed in IPI Criminal 4th No. 3.15 based on the "evidence," which may include the kind of social science evidence proposed in Allen. Rodriguez, 387 Ill. App. 3d at 827. This court explained that this issue should be decided on a "case-by-case basis, as both Allen and the IPI committee encourage the trial court to do." Rodriguez, 387 Ill. App. 3d at 824, citing People v. Enis, 139 Ill. 2d 264, 289-90 (1990) (endorsing a case-by-case approach to admitting eyewitness expert testimony about the correlation between a witness's certainty and the accuracy of his or her identification).

Here, defendant argues that the circuit court failed to give the matter "serious consideration." However, unlike Allen, where the trial court refused proposed testimony of an eyewitness identification expert without first conducting "a meaningful inquiry" into its relevance, no such evidence was offered in this case. The record shows that during the jury instruction conference, defendant presented his argument that social science research has shown that "[t]he level of certainty shown by the witness when confronting the defendant with regard to the identification is completely irrelevant in terms of reliability of the identification." The

-43-

circuit court listened to defendant's argument then determined that it would give IPI Criminal 4th No. 3.15 with all five Biggers factors. Defendant also presented the same argument in his posttrial motion to reconsider, which the circuit court rejected. We cannot find that the circuit court abused its discretion when it chose to use all the factors listed in IPI Criminal 4th No. 3.15 in this case.

### E. Mittimus Correction

Defendant lastly contends, and the State agrees, that the mittimus should be corrected to reflect that he is entitled to 810 days of presentencing custody credit, rather than 712 days of credit. The record shows that defendant was taken into custody on December 22, 2005, and defendant remained in custody for the instant case until he was sentenced on March 11, 2008. Defendant was therefore in custody for a total of 810 days prior to sentencing in this case. Accordingly, we correct the mittimus to reflect that defendant is entitled to 810 days of credit against his sentence. See 134 Ill. 2d R. 615(b)(1) (appellate court may correct trial court orders as necessary); People v. Douglas, 381 Ill. App. 3d 1067, 1069 (2008) (appellate court may correct mittimus without remanding the cause to the trial court).

For the above stated reasons, we affirm the judgment of the circuit court and correct the mittimus.

Affirmed and mittimus corrected.

MURPHY, J., concurs.

NEVILLE, J., dissents.

1-08-0867

JUSTICE NEVILLE, dissenting:

I respectfully dissent because I believe the trial court's finding that Polk knowingly and intelligently waived his right to remain silent is against the manifest weight of the evidence.

When a defendant challenges the admissibility of his confession, the State bears the burden of proving that the defendant confessed voluntarily. People v. Braggs, 209 Ill. 2d 492, 505 (2004). As part of that burden, the State must prove that the defendant knowingly and intelligently waived his Miranda rights. Braggs, 209 Ill. 2d at 505. Before police interrogate a suspect in custody, they must give him three separate, but related, warnings. They must warn him that the State may use against him any statement he makes, they must inform him that he has the right to counsel, and they must inform him that he has a right to remain silent. Miranda v. Arizona, 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602, 1628 (1966). If the defendant does not understand these rights, he cannot knowingly and intelligently waive them. Braggs, 209 Ill. 2d at 514-15. Thus, to introduce a confession into evidence, the State must show that the defendant had "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Patterson v. Illinois, 487 U.S. 285, 292, 101 L. Ed. 2d 261, 272, 108 S. Ct. 2389, 2395 (1988).

To assess the defendant's understanding of his rights, the trial court should consider his background, experience and conduct. Braggs, 209 Ill. 2d at 515. Polk, 17 years old at the time of questioning, read at the level of a seven-year-old child. Moreover, Polk had an IQ of 70, indicating extremely low intellectual functioning. Sergeant Barz asked Polk whether he understood what the right to remain silent meant. Polk shook his head to indicate no. Sergeant Barz never explained the right to remain silent to Polk. Instead, Sergeant Barz warned Polk that

-45-

the State could use against him any statements he made, and he informed Polk of his right to an attorney. Sergeant Barz told Polk he could waive his right to remain silent and make a statement if he wished to do so. Again, Sergeant Barz asked Polk if he understood, and Polk said, "What, what was that last one?" Sergeant Barz never explained to Polk that he had a right not to answer any of the questions the police asked him, and he never explained that Polk could stop the police from questioning him by invoking his right to remain silent. Sergeant Barz simply plowed ahead with substantive questioning without taking any further steps to ensure that Polk understood his rights.

In this case, after reviewing the record, I found that the trial court's finding was against the manifest weight of the evidence because the evidence shows that Polk, a 17-year-old with extremely low intellectual functioning, never in any way indicated that he had even a marginal understanding of his right to remain silent. Polk did not understand what the right to remain silent meant so he could not knowingly and intelligently waive his right to remain silent. Here, the trial court should have granted Polk's motion and suppressed his confession because the State failed to prove that Polk confessed voluntarily. Therefore, I would reverse the conviction and remand for a new trial because, without a knowing and intelligent waiver of his right to remain silent, Polk did not confess voluntarily.