2022 IL App (2d) 210186-U
No. 2-21-0186
Order filed November 22, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-3018 |
| WILLIE C. JACKSON, | ) ) ) | Honorable George D. Strickland, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices McLaren and Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) Defendant did not establish the mitigating factors to reduce his conviction from first-degree murder to second-degree murder. (2) The trial court did not err in denying defendant's motion to suppress his statements, where defendant did not invoke his right to counsel. (3) The trial court did not fail to consider mitigating evidence in sentencing defendant to 36 years' imprisonment. Affirmed.

¶ 2    After a jury trial, defendant, Willie C. Jackson, was convicted of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2016)) and sentenced to 36 years' imprisonment. He appeals, arguing that his: (1) conviction should be reduced to second-degree murder, because he had an actual, albeit unreasonable, belief that he had to shoot the victim to save his own life; (2) motion to suppress his

statements to police should have been granted, because he invoked his right to counsel during the interview; and (3) sentence was excessive, where the trial court did not find in mitigation that defendant acted under strong provocation. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The victim, Daviontay Jackson (Daviontay), age 17, was killed on November 11, 2016, in Waukegan. Afterwards, around January 2017, defendant, age 18 and no relation to Daviontay, was arrested in Tennessee.

¶ 5                           A. Defendant's Statements to Police

¶ 6     On January 3, 2017, Waukegan police sergeant Scott Thomas and detective Jaroslaw Grzeda drove to Tennessee to interview defendant. In Tennessee, they learned that defendant had waived extradition, and they asked him if he wished to speak with them in Tennessee or Waukegan. Defendant chose Waukegan.

¶ 7     On January 4, 2017, officers interviewed defendant at the Waukegan police station. The interview was recorded. In the video, Sergeant Thomas told defendant that he wanted to get his side of the story. He Mirandized defendant and led the questioning. Defendant stated that he knew there was a warrant for his arrest. He related that, on November 11, 2016, he had gone to "Ace's" (Aaron Kinzer's) house and was in the room when Daviontay was killed. Defendant next asked, "Can I call my grandma, cuz she said [indiscernible]," and Thomas replied that he could, but Thomas wanted "to get through some of this, what was going on" and to get defendant's side of the story.

¶ 8     Defendant stated that he and his uncle Jeremiah went to Ace's house, and Daviontay said that he was going to kill defendant. Ace, "D'tay" (Javante Kinzer, Aaron's brother) and "Shorty" (Daviontay) were there. Daviontay, according to defendant, was playing with a rifle, acting crazy,

and waving it around. Defendant told Daviontay to stop playing with the rifle and to put it down. Daviontay talked back angrily, and defendant told him to calm down. Daviontay responded, "I'll smoke you." Defendant replied, and Daviontay "kept talking." They wrestled over the rifle, and defendant got it. After that, defendant "blanked out."

¶ 9 When asked what he meant by "blanked out," defendant asked a second time to call his grandmother, "because she told me ***" Thomas interrupted, saying yes, "100%", and that defendant could make as many calls as he wanted and that his grandmother could even come down to the station. Defendant responded, "No, it's like." Thomas continued, noting that they were "halfway there," and he wanted to ask defendant a few more questions. Defendant responded, "all right."

¶ 10 Defendant stated that, after he blanked out, he ran outside of the Kinzer house and into the middle of the street. Defendant had not spoken to Jeremiah or the Kinzers since the shooting. Prior to the shooting, he had been to Ace's house "a lot" or about three times. However, he had never seen Daviontay before. The day before the shooting, defendant was at the Kinzers' house, and they took pictures together with the rifle. Defendant knew the gun was loaded. Defendant stated that the rifle was at the home when he arrived, and he believed it was the Kinzers' uncle's rifle.

¶ 11 Sergeant Thomas asked if defendant's fingerprints would also be on the .40-caliber handgun that had also been in the room and noted that forensics personnel could assist in determining whether there were fingerprints on the gun. Thomas noted that people lie to the police all of the time. No one was saying that defendant was a bad guy, but sometimes stupid things happened.

¶ 12    Defendant stated that he was confused.  He asked a third time to call his grandmother: "I wanna call my grandma, cuz she told me not to even talk to y'all without, like calling her, cuz she got a lawyer."  Defendant stated that his grandmother was in Chicago.  Thomas asked if she was going to be able to help defendant.  Defendant replied that she was "trying to send a lawyer" and "she says she got a lawyer."  Defendant confirmed for Thomas that his grandmother answered her phone.  Thomas asked for her phone number, and defendant gave it to him.  The officers left the room.

¶ 13    Detective Grzeda returned, stating that Thomas was calling the number that defendant provided.  He noted that defendant's demeanor had changed from the car ride.  Grzeda stated that people make mistakes and that defendant was a good kid, so he should explain what happened.  He reviewed photographs with defendant, who identified Ace, D'Tay, Daviontay, the AR-15 rifle, and a handgun.  Defendant stated that he believed that the handgun belonged to Daviontay.

¶ 14    Addressing the rifle with which defendant had taken a photo the day before, defendant stated that he knew that it was loaded because he had taken out the clip and saw bullets in it.  However, when Grzeda asked how a bullet had entered the chamber, defendant stated that he did not know, and he did not know what it meant to "rack" a rifle.

¶ 15    Defendant explained that Daviontay was "messing with" the rifle and waving it around.  Defendant told him to calm down, but Daviontay started talking crazy, stating that defendant did not know him, and called defendant a "bitch."  Defendant told Daviontay to put it down.  Daviontay said that he was going to kill defendant.  Everyone in the room said stop.  Defendant grabbed the gun, and Daviontay pulled on it as well.  Defendant got the trigger end and pulled the trigger.  He did not know how many times.

¶ 16    Defendant stated that he told Daviontay to stop, but that Daviontay pointed the rifle and so defendant got up and wrestled with him. "And I grabbed it and shot him." After being shot in the face, Daviontay got up and rushed at defendant, and, so, defendant continued shooting. The first shots were to Daviontay's face or neck, and Daviontay came at defendant, who moved out of the way. Daviontay fell at the front door, and defendant left out the back door. Afterwards, outside, a dog ran up and scared defendant, causing him to shoot the rifle. Defendant dropped the rifle and ran off.

¶ 17                                B. Motion to Suppress

¶ 18    On October 19, 2017, defendant moved to suppress his statements to police, arguing that they were made after he invoked his right to counsel. He asserted that, during the police interview, he told police on several occasions that he wanted to speak with his grandmother and, finally, that she had hired him an attorney and that he believed the attorney was going to come to the police station. He also told police that he was not supposed to speak with them until he spoke to his grandmother because she got him an attorney. In the motion, defendant argued that his statements reflected a clear desire to cease communication with the officers until he could speak to his grandmother and his attorney. Thus, his statements were elicited in violation of his constitutional rights and in violation of *Miranda v. Arizona*, 3384 U.S. 436 (1966).

¶ 19    At the hearing on defendant's motion, Detective Grzeda testified that, while in Tennessee, he and Sergeant Thomas gave defendant the opportunity to speak to them there or to do so in Illinois. Defendant did not tell the detectives that he wanted to return to Waukegan because he had spoken to his grandmother and had an attorney. Grzeda further testified that at no time while he and Thomas spoke to defendant in the jail in Tennessee did defendant ask to speak to an attorney. Sergeant Thomas also denied that defendant told the detectives in Tennessee that his

grandmother had hired an attorney and that is why he wanted to return to Waukegan. During the interrogation, when he stepped out of the interview room, Thomas tried to call defendant's grandmother but could not reach her. An attorney eventually arrived at the police department, but it was after the interview with defendant had concluded.

¶ 20    Defendant testified that he called his grandmother from the Tennessee jail. She instructed him not to say anything and that she had an attorney for him. The next day, he met the Waukegan detectives, who asked him if he wanted to speak there or in Waukegan. According to defendant, he responded that he wanted to go back to Illinois because his grandmother had an attorney for him. He did not state that he was not going to speak to the detectives because he had an attorney. Defendant never said to the police that he wanted a lawyer, but that is what he intended/meant. "When I said I was going to call my grandma, that's what I meant."

¶ 21    Dorothy Jackson, defendant's grandmother, testified that, in early January 2017, she learned that defendant had been arrested in this case and that the police were looking for him. Multiple times, they came to her house, looking for defendant. After this and before defendant was arrested, Dorothy spoke to an attorney. After defendant was arrested, defendant called Dorothy from the Tennessee jail. Dorothy told defendant not to speak to anyone and informed him that someone, *i.e.*, police, was going to come get him and bring him back to Illinois. She told him not to speak to anyone until she brought his attorney. Dorothy told defendant that she got him an attorney. Dorothy testified that she did not give defendant the name and phone number of the attorney that she had hired for him. "I just told him that I had a lawyer." She did not pay the attorney or meet him in person. She spoke to him on the phone the day defendant arrived back in Illinois. Dorothy paid the attorney when they met at the police station. The attorney was in

Chicago, and his name was "David." She could not recall his last name. Dorothy spoke to the attorney both before and after defendant was arrested.

¶ 22 The trial court denied defendant's motion, finding that his statements were not unambiguous requests for an attorney or to terminate the interview. It found that, even if defendant wanted to return to Illinois because Dorothy had an attorney, that was not necessarily inconsistent with the detectives' testimony that defendant did not request an attorney while in Tennessee.

¶ 23                                      C. Trial

¶ 24                              1. State's Case-in-Chief

¶ 25 Trial commenced on May 8, 2019. The State's theory of the case was that defendant, who was with his uncle, went to visit his friends, Ace and D'tay, and Daviontay was present at the home. There was an AR-15 rifle and handgun in the home, and the friends were taking Snapchat videos of themselves with the guns. Defendant and Daviontay got into a verbal altercation, defendant took the rifle, and he shot Daviontay 10 times. Defense counsel argued that defendant acted in self-defense, because Daviontay was pointing the rifle at him and threatening to kill him.

¶ 26                     a. Detectives Chris Llenza and Joshua Amann

¶ 27 Detective Chris Llenza played his bodycam video of his arrival at the scene (415 McKinley in Waukegan) on November 11, 2016, at about 8:21 p.m. In the video, Daviontay's body is at the foot of an interior staircase that is just inside the front entrance to the house. Detective Joshua Amann took photographs at the scene. They depicted splatters and pools of blood around the living room and a bloody handprint smear on the wall between the living room and the doorway where Daviontay's body was found. Shell casings were recovered from the living room, dining room, and under Daviontay's legs in the stairwell. The rifle was recovered in a yard behind a home across and down the street from the scene at 408 McKinley. There was a bullet hole in the

driveway pavement. Llenza testified that, when he first arrived at the scene, Daviontay's wounds appeared to be smoking from gunshots. The body laid about 10.56 feet from a red chair.

¶ 28                                      b. Forensic Testimony

¶ 29    Sarah Pendley, a deputy coroner in Lake County, took photographs of Daviontay's body at the scene. They depicted a bullet fragment on the wall, blood spatter in the living room and stairwell, brain matter on the stairs, and two cartridges below Daviontay's feet.

¶ 30    Kristen Alvarenga, a medical examiner/forensic pathologist employed by the State, a subcontractor for various coroners' offices, and an assistant medical examiner at the Cook County medical examiner's office, testified as an expert in forensic pathology. She performed Daviontay's autopsy. Daviontay sustained gunshot wounds, including to the back of his head (fatal), left side of his jawline, his chin, and his back. In total, he sustained five shots to the front and five to the back, along with three graze wounds. Four of the wounds were considered fatal injuries. Two of the three head and face wounds showed stippling, *i.e.*, abrasions on the skin caused by unburned powder, which is a sign that the gun was fired from very close range, *i.e.*, between six inches and two feet. Only one of the shots below the chin showed stippling, but clothing might have prevented its appearance.

¶ 31    Gary Lind, a forensic firearm examiner, testified that all of the casings recovered from the scene were .223-caliber and fired from the recovered AR-15 rifle. The rifle in the video had an empty magazine well, and, in order to fire from it more than one shot, the magazine would have been inserted. When fired, the rifle would eject casings that fly out at variable lengths and different directions based on the direction of the rifle.

¶ 32    Maria Salazar, a forensic scientist at the Northeastern Illinois Regional Crime Laboratory, testified that Daviontay's DNA was present on swabs taken from the AR-15 bolt release, but

defendant's DNA was excluded. There were four DNA profiles on the rifle's grip, but no individual was identified.

¶ 33                                c. Stipulation and Surveillance Video

¶ 34    The parties stipulated that, on November 11, 2016, at 8:04 p.m., Daviontay's Snapchat account posted a video depicting Daviontay pointing forward an AR-15 rifle without a magazine at the camera. Daviontay was silent in the video. However, in the background, defendant and his uncle discussed which type of bullet might be preferable to be shot with.

¶ 35    Nelson Campos, a neighbor who lived two doors down from the scene, presented surveillance video from his home from the evening of the shooting, at around 8:15 p.m. The video showed a male running and a dog following behind him.

¶ 36                                        d. Eileen Thomas

¶ 37    Eileen Thomas, an accountant, lived at 415 McKinley, with her three sons. On the night of the shooting, which occurred on the first floor of her residence, she was upstairs with her brother-in-law. Her sons, Javante and Aaron, were on the first floor. Thomas heard gunshots and initially thought the sounds came from outside. Prior to hearing the shots go off, Thomas heard arguing downstairs. She then heard more shots and ran to the stairs. She saw a young man with a rifle standing over Daviontay, who was on the stairs. Thomas said, "I know you're not about to shoot this mother fucker up in my crib." The man lowered his gun and shot Daviontay. The young man wore a hoodie and was brown skinned. Thomas did not see his face. When Thomas started coming down the stairs, the man ran out the back of the house. Aaron and Javante were not the shooters.

¶ 38    In November 2016, Thomas had just lost her husband and was going through hard times. She used narcotics and had some drug-related convictions. "[A]t the time[,] I was in my

addiction." That day, Thomas used drugs, but she had not yet used them at the time of the shooting. However, she also testified that she told an investigator that "I had been using drugs that morning. I was sick." She was waiting for her supplier to arrive so that she could purchase the drugs. Thomas used heroin.

¶ 39    Thomas pleaded guilty to retail theft in April 2017. She was placed on probation and had two separate charges of possession of a controlled substance that were dismissed, as well obstruction of justice and another retail theft charges that were dismissed.

¶ 40                                  e. Detective Grzeda

¶ 41    Detective Grzeda testified about the interrogation of defendant that he and Thomas conducted. A recording of the interview was played for the jury.

¶ 42    The State rested. Defendant's motion for a directed verdict was denied.

¶ 43                          2. Defendant's Case-in-Chief

¶ 44                              a. Sergeant Thomas

¶ 45    Sergeant Scott Thomas testified during defendant's case-in-chief that he interviewed Eileen Thomas on November 11, 2016, at 9 p.m. A portion of the interview was recorded. She told Sergeant Thomas that she heard gunshots and ran to the stairs. Eileen never told Sergeant Thomas that she said to the shooter, "I know you're not about to shoot no mother fuckers in my crib."

¶ 46                              b. *Lynch* Evidence

¶ 47    Defense counsel entered several pieces of *Lynch* evidence. *People v. Lynch*, 104 Ill. 2d 194 (1984) (addressing admissibility of character evidence where self-defense is raised). By stipulation, counsel entered videos from Daviontay's phone posted to the internet. An exhibit depicted Daviontay pointing a revolver at the camera and asking if "one of y'all wants a war."

Another exhibit depicted him in a car pointing a semi-automatic gun at the camera and saying, "What's up?" A photo from Daviontay's phone of him pointing a gun at the camera was entered, as were his juvenile adjudications for mob action and aggravated battery in 2013 and aggravated battery in 2014. Dennis Gillespie testified to a 2014 battery in which Daviontay started a fight with him.

¶ 48                                    c. Defendant

¶ 49    Defendant testified that, in November 2016, he lived in Chicago with his grandmother. He had relatives in both Chicago and Waukegan. He was in Waukegan in November 2016 for a job interview that his aunt had arranged. Prior to November 11, 2016, he had been in Waukegan for about one week. The day before the shooting, defendant went to his friends', Ace and D'Tay's house. There, he saw the rifle. He touched it and took a photo of it, which he sent to his cousin. Daviontay was not at the house that day.

¶ 50    On November 11, 2016, defendant and his uncle went from his aunt's house to the Kinzers' house. They talked with Ace and D'Tay. Daviontay, whom he had never seen before, was also there. They were in the living room on the first floor. Daviontay held the rifle, and Ace held the handgun. The magazines were in the guns. Everyone talked about the guns and passed them around. At one point, they were unloaded by the Kinzers. Everyone talked about the bullets.

¶ 51    Daviontay loaded the rifle. He sat in a red chair. The others talked about how defendant had been gone for a while. Daviontay started playing with the gun, *i.e.*, pointing it at the others and waving it around. Defendant, Ace, and D'Tay told Daviontay to stop. (Jeremiah was not in the room.) Daviontay waived them off, and defendant told him to stop. According to defendant, Daviontay became angry and cursed at defendant. "[Daviontay] said stuff like who the fuck is

you, fuck you, shit like -- stuff like that." Defendant said, "bro, just stop, fuck you, stop playing with the gun." They continued to argue and curse back and forth.

¶ 52    At one point, Daviontay yelled, "I'll smoke your ass, bitch" and pointed up the rifle (parallel to the ground). Defendant was scared. Defendant replied, "you don't even know me, stop. I just told him, bro, stop, basically." Daviontay became madder. He said, "I'll kill you in this bitch" and raised the gun (parallel to the ground). Defendant believed that Daviontay was going to kill him. Defendant jumped up and grabbed the rifle and pushed the barrel away to the left. With his right hand, he grabbed the gun and pushed it toward Daviontay's chest. They each then pulled on the gun. Defendant got the butt of the rifle, and a shot went off. Defendant had pulled the trigger, but not on purpose. After being shot in the face, Daviontay jumped up and grabbed the rifle. Defendant believed that Daviontay was going to kill him, so he started pulling the trigger. He did not know how many times he pulled it.

¶ 53    They struggled around the room, and defendant stopped shooting when he felt like Daviontay was no longer a threat. Defendant ran out the back, and a dog came by. He fired another shot in the driveway, dropped the rifle, and ran. Defendant ran to the Metra station in North Chicago and went to his grandmother's house in Chicago. He did not turn himself in because his family wanted to get money to hire an attorney. He stayed in Chicago for about 20 days and then his mother drove him to Tennessee to his grandfather's house.

¶ 54    About one month later, defendant was arrested in Tennessee. From the jail there, he called his grandmother, who told him not to say anything because she had a lawyer. During his statement to police, defendant was torn between telling his side of the story and wanting to listen to his grandmother.

¶ 55     On cross-examination, defendant testified that he did not know how many total times he shot Daviontay.  Defendant shot Daviontay four times in the front.  When the first shot, which hit Daviontay in the face, went off, Daviontay's hands were still on the rifle.  He then took off his hands from the rifle, but then stood up, grabbed the barrel again. Defendant started pulling the trigger.

¶ 56     Defendant denied that he went to the stairs and shot Daviontay point blank in the head.  He did not know how brain matter ended up above the stairs near Daviontay's body.

¶ 57                              d. Investigator Marilu Serrato

¶ 58     Marilu Serrato, an investigator for the defense, testified that, in January 2019, she had a cell phone conversation with Eileen Thomas, who told her that, on the night of the shooting, she was upstairs in the bedroom listening to YouTube videos and doing drugs.

¶ 59     The defense rested and renewed its request for a directed verdict on first-degree murder and to only send second-degree murder for deliberation.  The trial court denied the motion.

¶ 60                              3. Verdict & Sentencing

¶ 61     During deliberations, the jury sent a question, asking if the mitigating factor must be present for the entirety of the shooting.  The court, after conferring with the parties, instructed the jury to continue deliberating.  The jury found defendant guilty of first-degree murder and personal discharge of a firearm causing death.

¶ 62     Defense counsel filed a motion, arguing that, under *Miller v. Alabama*, 567 U.S. 460 (2012), and *People v. Buffer*, 2019 IL 122327, the 25-year firearm enhancement was unconstitutional as applied to defendant.  A defense expert psychologist, James Garbarino, testified on brain development of 18-year-olds and defendant's psychological history and development.

The trial court found that *Buffer* did not apply, but that the enhancement statute was unconstitutional as applied under *Miller*.

¶ 63    At sentencing, the court received the presentence investigation report (PSI), victim impact statements, defendant's family statements, and a transcript of the psychologist's testimony.

¶ 64    Garbarino, a developmental psychologist, testified as an expert that his area of expertise is developmental psychology, with an emphasis on the impact of trauma. He is not a clinical psychologist. He met with defendant for two hours and reviewed the PSI, police reports, and other materials. Garbarino explained that, in developmental psychology, adolescence begins around age 10 or 11 and continues up to about age 21. The brain is fully developed at age 25. An 18-year-old does not have a fully developed mature brain. The brain's limbic system, which controls emotion, and the prefrontal cortex, which controls reasoning, both mature through the adolescent period. Fully mature adults who have not experienced an injury can coordinate the two systems effectively, whereas immature people do not. An 18-year-old's executive function deteriorates in situations of hot cognition, *i.e.*, the ability to perform in an intense situation.

¶ 65    Defendant exhibited traits of impulsivity more similar to an adolescent than an adult. The crime itself included elements of a highly aroused situation, dramatic violent behavior, and impulsive efforts to escape, which reflect adolescent impulsiveness rather than adult deliberative maturity.

¶ 66    Defendant scored a 9 out of 10 on the Adverse Childhood Experience Scale, which assesses how adversity predicts certain social conditions/behaviors, including violence. Only 1 out of 1000 individuals score an 8, 9, or 10. Defendant had suffered physical assault/punishment, two sexual abuse incidents, and he witnessed someone being shot when he was five years old. These childhood experiences have a strong correlation with suicidal behaviors, substance abuse,

depression, and violent behavior. Defendant had a "war zone mentality." One element that emerges is a hypervigilance, *i.e.*, hypersensitivity to threat, and a belief about when it is legitimate to use violence, *i.e.*, preemptive assault. Defendant's childhood experiences and his stage of brain development at age 18 affected his ability to appropriately perceive, and react to, a threatening situation. Defendant, however, did not show signs of incorrigibility, lack of empathy, or psychopathy.

¶ 67    Lake County sheriff's lieutenant Nick Kalfas, worked in the corrections division and testified that he was aware of notifications of any inmate rule violations. Defendant came into the Lake County jail on January 5, 2017, and remained in its custody through the date of the sentencing hearing (April 1, 2021). There were seven incidents with the defendant during his stay where he was taken to the administrative segregation unit (ASU). The ASU is a housing unit within the jail for inmates who violate the in-custody rules and commit major rule infractions. They can spend between 1 and 60 days in the unit, depending on the seriousness of the infraction. In the ASU, inmates receive one hour outside their single cell per day.

¶ 68    The incidents that let to defendant going to the ASU included: (1) him exposing himself to female officers in the jail (following a hearing, defendant was sentenced to 15 days' disciplinary lockdown); (2) twice failing to immediately lock down and threatening harm to others (defendant accepted a settlement for 14 days in the ASU for the first infraction and 25 days for the second); (3) fighting with two other inmates (settlement for 45 days); (4) fighting with an inmate (60 days in the ASU); (5) insubordination and profanity (settlement for 21 days); (6) and fighting and interference with staff duties (settlement for 45 days). Defendant also had 70 violations for minor incidents.

¶ 69    Sara Price, a social worker for the Lake County Public Defender's office, testified that she met with defendant over 150 times in the jail to assess how he was doing. Defendant told Price that he was concerned about his family members' health and his relationship with his younger brother. Many times, defendant expressed remorse for the shooting. They discussed impulsivity and controlling his decision-making process, and, over time, defendant understood that he needed support to process the things he was dealing with in order to respond. Over his time in incarceration, he grew and matured.

¶ 70    Defendant, in allocution, apologized for his actions. The State sought a sentence of 50 years' imprisonment, and defense counsel argued that a sentence in the "low 20's" was appropriate.

¶ 71    The trial court sentenced defendant to 36 years' imprisonment. It noted that it had considered counsels' arguments, the testimony and exhibits, the *Miller* factors, the PSI, Garbarino's testimony, the jail disciplinary records, victim impact statements, Price's testimony, and defendant's statement in allocution, along with all the evidence in aggravation and mitigation.

¶ 72    The court found that defendant was an "extremely impulsive, immature person[.]" In assessing the trauma defendant experienced, the neighborhood in which he grew up, and his family, the court found that the factors were mixed. He had a home, had the ability to obtain an education of which he did not take advantage, and a loving family. However, he was on probation for burglary at the time of the offense.

¶ 73    Defendant did not load the rifle, the court determined, but caused it to discharge. His trip to Tennessee constituted flight and reflected his consciousness of guilt. The court further found that Daviontay did not provoke the shooting. Defendant and Daviontay were "kids playing with weapons that belong in the hands of S.W.A.T. teams and the military. Very dangerous weapons." They were not "serious" and were just acting "cool."

¶ 74     The court also determined that Daviontay did not threaten defendant and that defendant did not believe that Daviontay was going to shoot him.  He "was angry that the gun was pointed at him[.]"  If defendant was actually worried, he could have walked out the door.  The court found that defendant did not act in self-defense or in the unreasonable belief in self-defense.  Rather, he was angry at Daviontay, and Daviontay was angry at him for telling him to stop.  Defendant's actions were immature and impulsive.  The court also noted that defendant "kept on shooting," and this was triggered by his anger.

¶ 75     The trial court found "particularly aggravating" the circumstances of the final shot in the stairway.  Noting Thomas's testimony concerning her observations of defendant by the stairway, which it found credible, the court determined that defendant's actions constituted "an execution" and a "very brutal act."  The court did not find the evidence sufficient to find one way or the other that defendant could be rehabilitated.

¶ 76     Subsequently the court denied defendant's motions for a new trial and to reconsider sentence.  Defendant appeals.

¶ 77                                II. ANALYSIS

¶ 78                          A. Second-Degree Murder

¶ 79     Defendant argues first that this court should reduce his conviction (Ill. S. Ct. R. 615(b)(3) (eff. Jan. 1, 1967)) to second-degree murder, because he had an actual, albeit unreasonable, belief that he had to shoot Daviontay to save his own life.  For the following reasons, we decline defendant's request.

¶ 80     The question whether a defendant unreasonably believed that circumstances justifying the lethal use of force were present is a factual one.  *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 144.  We will reverse a determination that a defendant failed to prove the presence of a mitigating

factor by a preponderance of the evidence when, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were *not* present. *Id.* A preponderance of the evidence is that amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not. *People v. Terrell*, 2022 IL App (1st) 192184, ¶ 46.

¶ 81 Second-degree murder is a lesser mitigated offense of first-degree murder. *People v. Brown*, 2014 IL App (4th) 120887, ¶ 24. A person is guilty of second-degree murder when the elements of first-degree murder are established but there also exists a statutory mitigating factor. *Id.* Defendant raised the imperfect self-defense form of second-degree murder. Under this form of second-degree murder, an offense of first-degree murder is lessened to second-degree murder when, "at the time of the killing [the defendant] believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of [the Criminal Code of 2012], but [the defendant's] belief is unreasonable. 720 ILCS 5/9-2(a)(2) (West 2016).

¶ 82 Once a defendant affirmatively raises self-defense, the burden shifts to the State to prove, in addition to the elements of first-degree murder, that the use of force was not justified beyond a reasonable doubt. *Castellano*, 2015 IL App (1st) 133874, ¶ 149. If the State negates the defendant's self-defense claim (by proving beyond a reasonable doubt that at least one of the six self-defense elements below is not present), the trier of fact must then find the defendant guilty of either first-degree or second-degree murder. *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995). To be guilty of second-degree murder based on an unreasonable belief in self-defense, the defendant must prove by preponderance of the evidence that the first five of the following six elements of self-defense existed: (1) force is threatened against the person; (2) the person threatened is not the

aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) the defendant actually and subjectively believed a danger existed that required the use of force applied; and (6) the person's beliefs were objectively reasonable. 720 ILCS 5/9-2(c) (West 2016); *Castellano*, 2015 IL App (1st) 133874, ¶¶ 149, 153.

¶ 83    Defendant argues that he established by at least a preponderance of the evidence the mitigating factor that he subjectively believed he needed to act in his own self-defense and that no rational trier of fact could have found otherwise. Defendant asserts that it was unrebutted that the shooting arose in self-defense. He notes that he tried to stop Daviontay from carelessly playing with and pointing the loaded semiautomatic rifle, that Daviontay threatened to kill him with it, and that he shot Daviontay in a struggle over the rifle after they argued. Defendant also notes that Daviontay told him that "I'll smoke your ass, bitch," and "I'll kill you in this bitch." Defendant was scared and believed that Daviontay was going to kill him, so he jumped up and grabbled the rifle. Daviontay, defendant notes, pushed the rifle around so it was pointing at him, they struggled over the gun, and a shot went off while Daviontay held the rifle with the barrel pointed at him. Daviontay, according to defendant, jumped up and grabbed the rifle again. Defendant was scared and believed that Daviontay would kill him, so he pulled the trigger again and continued pulling multiple times. They struggled around the room, and the rifle continued firing. Defendant pulled the trigger until he no longer felt threatened by Daviontay.

¶ 84    Defendant allows that it might have been a bad idea to grab a loaded rifle from someone making threats, but maintains that he was not in a position to hesitate. Daviontay was a stranger to him, and it was not unreasonable to believe that Daviontay would make good on his threat when the rifle was to defendant's face. There was also a handgun somewhere nearby, and defendant

believed that it was Daviontay's gun. Even if Daviontay did not have control of the rifle, he suggests, he might have had, or taken, control of the gun to make good on his threats.

¶ 85    Further, defendant argues that there was no testimony that countered his version of how the shooting and struggle transpired in the living room. This includes, he contends, Eileen Thomas's testimony. He asserts that Thomas, who testified that she saw Daviontay shot once on the stairwell, was substantially impeached. The police, he contends, testified that Thomas did not tell them that she saw the shooter point the gun at Daviontay lying at the bottom of the stairs and shout that there would be no shooting going on in her house. Defendant also points to Thomas's testimony that she was "in her addiction" at the time of the shooting and while giving her statement. Her perception and memory were not very good, and it was difficult for her to recall the events. Thus, defendant argues, he had a subjective belief in the need to defend himself and, to the extent that his continued shooting exceeded reasonable self-defense beyond the threat actually posed by Daviontay, the State did not rebut the contention that defendant did, in fact, have a belief in the continued need for self-defense through the struggle, even if that belief was unreasonable.

¶ 86    Viewing the evidence in the light most favorable to the prosecution, we conclude that no rational jury could have found that the mitigating factors were present. That is, no reasonable jury could have found that defendant held a belief, even an unreasonable one, that he was in imminent danger and that he actually and subjectively believed that had to shoot Daviontay to save his own life.

¶ 87    Defendant's statements and testimony did not reflect that he believed that Daviontay was going to kill him. Defendant, Daviontay, and the Kinzer brothers took turns playing with the rifle and shot videos of themselves showing off with it. Even if Daviontay and defendant argued over Daviontay pointing the rifle toward defendant and the others, it is not plausible that defendant

would believe, even unreasonably, that his life was in danger when Daviontay allegedly stated that he was going to kill him. Defendant never tried to leave the Kinzer home, but grabbed the rifle and shot Daviontay. The shooting reflected defendant's impulsiveness, not his subjective belief that there was an imminent threat of harm to him.

¶ 88 We find further support for our conclusion in the fact that defendant shot Daviontay 10 times (9 times after which Daviontay no longer held the rifle), which reflects a passion born of anger and impulsiveness rather than fear of impending death. Indeed, five shots hit Daviontay in the back, which does not reflect that Daviontay was a threat or support defendant's claim of self-defense, but rather, that he likely tried to escape.

¶ 89 During the police interview, defendant told Sergeant Thomas and Detective Grzeda that, the day before the shooting, he went to the Kinzer home and took photos with the rifle. The next day, November 11, 2016, defendant and his uncle Jeremiah went to the Kinzer home. Daviontay, whom defendant did not know, was there, playing with the rifle, acting crazy, and waiving it around. He became angry when defendant told him to stop playing with the rifle and to put it down. Daviontay allegedly told defendant, "I'll smoke you," called defendant a "bitch," and stated that he was going to kill defendant. At this point, defendant claimed, he grabbed the rifle, which he knew was loaded, and he and Daviontay wrestled over it. Defendant told police that he grabbed the trigger end and, contrary to his initial statement that the "blanked out" after this, told them that he pulled the trigger, shooting Daviontay in the face. Next, defendant claimed that, after being shot in the face, Daviontay was able to stand and come at defendant. Defendant continued shooting. Daviontay fell at the front door, and defendant left out the back door.

¶ 90 At trial, defendant testified that, before he grabbed the rifle, Daviontay yelled, "I'll smoke your ass, bitch" and pointed up the rifle. Defendant testified that he was scared, told Daviontay to

stop, but that Daviontay became madder, stating, "I'll kill you in this bitch" and raised the gun again. Defendant testified that he believed that Daviontay was going to kill him, and he jumped up and grabbed the rifle. Defendant shot Daviontay. Daviontay took his hands off the rifle but then stood up and grabbed the barrel again. Defendant pulled the trigger again. They struggled around the room, and defendant stopped shooting when he felt like Daviontay was no longer a threat. He denied knowing how many times he shot Daviontay and denied that he went to the stairs and shot Daviontay point blank in the head. Defendant also claimed that he did not know how brain matter ended up above the stairs near Daviontay's body.

¶ 91    Eileen Thomas, Javante and Aaron's mother, testified that she was on the second floor of the Kinzer home on the night of the shoot and ran to the stairs when she heard gunshots. She saw a young man with a rifle standing over Daviontay, who was on the stairs. The man lowered his rifle and shot Daviontay. The jury heard that Eileen used heroin and that she had told an investigator that she had been using drugs that morning. The jury also heard investigator Serrato's testimony that Eileen told her that, on the night of the shooting, she was upstairs doing drugs. However, contrary to defendant's assertion here, Sergeant Thomas was not asked whether Eileen told him that she saw the shooter at the bottom of the stairs, pointing the gun at Daviontay. He did testify that Eileen stated that she heard gunshots and ran to the stairs and that she did not tell Sergeant Thomas that she spoke to the shooter.

¶ 92    The physical evidence reflected that the Daviontay tried to escape from defendant but that defendant kept shooting at him. Daviontay's body was located at the foot of the staircase just inside the front entrance to the Kinzer home. There were splatters and pools of blood in the living room, a bloody smear handprint on the wall between the living room and doorway/stairs where Daviontay's body was found, blood spatter in the stairwell, and brain matter on the stairs. Shell

casings from the rifle were recovered from the living room, dining room, and two from under Daviontay's legs in the stairwell. The medical examiner testified that Daviontay sustained five shots to the front and five to the back, along with three graze wounds. Four of the wounds were considered fatal, and two of the head and face wounds showed stippling, which reflected that the rifle was fired from very close range.

¶ 93    Any rational jury would have discounted much of defendant's testimony and found implausible his explanations for his actions. For example, defendant denied going to the stairs and shooting Daviontay in the head. However, when asked to explain the presence of brain matter above Daviontay's body in the stairway area, defendant responded that he did not know how it got there. Also, defendant framed his version of the events as a continued struggle over the rifle. However, a rational jury could have determined that Daviontay sought to escape from the home, which goes toward explaining how his body ended up at the stairway near the front door and explains the five shots to his back. Also, about 20 days after the shooting, defendant fled to Tennessee. Flight is indicative of guilt. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 59 (flight from scene of crime, as well as disposal of the firearm, is "competent circumstantial evidence that refutes the theory that [a] defendant acted in self-defense," even under an unreasonable-belief theory); *People v. Seiber*, 76 Ill. App. 3d 9, 14 (1979) (noting that the defendant's flight from the scene was evidence of consciousness of guilt, which negated a claim of self-defense).

¶ 94    In summary, viewing the evidence in the light most favorable to the prosecution, no rational jury could have found that the mitigating factors for second-degree murder were present.

¶ 95                    B. Suppression Motion

¶ 96    Next, defendant argues that the trial court erred in denying his motion to suppress his statements to police, where he invoked his right to counsel during the interview. He requests that we vacate his conviction and remand for a new trial. For the following reasons, we reject defendant's argument.

¶ 97    Reviewing courts apply a mixed standard of review when examining a ruling on a motion to suppress evidence. *People v. Heritsch*, 2017 IL App (2d) 151157, ¶ 8. The trial court's factual findings are afforded great deference and are reversed only if they are against the manifest weight of the evidence. *Id.* A finding is against the manifest weight of the evidence where it is unreasonable. *Terrell*, 2022 IL App (1st) 192184 ¶ 51. The court's ultimate decision to grant or deny the motion is reviewed *de novo*. *People v. Close*, 238 Ill. 2d 497, 504 (2010).

¶ 98    Under *Miranda*, and as a means to protect the fifth amendment right against self-incrimination, an individual subjected to custodial interrogation or under the imminent threat of interrogation is entitled to have retained or appointed counsel present during the questioning. *Miranda*, 384 U.S. at 444-45; *People v. Schuning*, 399 Ill. App. 3d 1073, 1081-82 (2010). If the accused requests counsel at any time during the interview, he or she cannot be subject to further questioning until a lawyer has been made available or the individual reinitiates conversation. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *In re Christopher K.*, 217 Ill. 2d 348, 376 (2005). In applying this rigid prophylactic rule developed in *Edwards*, courts must determine whether the accused actually invoked his or her right to counsel. *Davis v. United States*, 512 U.S. 452, 458 (1994); *Christopher K.*, 217 Ill. 2d at 376. This is an objective inquiry, which, at a minimum, requires some statement that reasonably can be construed as an expression of a desire for counsel. *Davis*, 512 U.S. at 459; *Christopher K.*, 217 Ill. 2d at 378. "[[S]imply referring to an attorney *** does not automatically constitute an invocation of the right to counsel." *People v.*

*Summerville*, 193 Ill. App. 3d 161, 169-70 (1990) (no invocation of right to counsel where the defendant claimed that he asked the person in whose apartment he was found, and in the arresting officers' presence, to call his attorney). A reference to an attorney that is ambiguous or equivocal, according to a reasonable officer in the circumstances, does not require cessation of questioning. *Davis*, 512 U.S. at 459; *Christopher K.*, 217 Ill. 2d at 378, 381. That is, the invocation must be sufficiently free from indecision or double meaning so as to reasonably inform authorities that the accused wishes to speak to counsel. *Christopher K.*, 217 Ill. 2d at 382; *People v. Tackett*, 150 Ill. App. 3d 406, 418 (1986). See, *e.g.*, *Christopher K.*, 217 Ill. 2d at 383-84 (no invocation of right to counsel, where the above-average-intelligence 14-year-old defendant asked, "Do I need a lawyer?"); *People v. Krueger*, 82 Ill. 2d 305, 311-12 (1980) (no invocation of right to counsel, where the defendant stated, "Maybe I need a lawyer" and "Maybe I ought to talk to an attorney").

¶ 99    Here, in denying defendant's motion, the trial court found that defendant's statements to police were not unambiguous requests for an attorney or to terminate the interview. It also determined that, even if defendant wanted to return to Illinois because his grandmother had an attorney, that was not inconsistent with the detectives' testimony that defendant did not request an attorney while in Tennessee.

¶ 100              1. Defendant's First Two Requests to Call His Grandmother

¶ 101    As to his first two requests to call his grandmother, defendant argues that they were sufficient invocations of his right to counsel. In his first request, defendant stated, "Can I call my grandma, cuz she said [indiscernible]." During his second request, he asked to call his grandmother, "because she told me ***" Defendant concedes that he did not explicitly mention that his grandmother had engaged an attorney on his behalf, but maintains that the police ignored the substance of his request, cut off any further articulation of his request, and distracted him from

his attempt to reach his attorney. Defendant contends that the detectives "understood that in asking to call his grandmother, [defendant] was attempting to contact the attorney she had for him." Defendant relies on his assertion that he had previously told the detectives in Tennessee that his grandmother had retained an attorney for him. The detectives denied this, but defendant contends that they demonstrated by their behavior that they understood that defendant was requesting an attorney on the first two occasions he requested to call his grandmother, where they interrupted his invocation with encouragement to continue giving a statement. He also contends that the trial court did not reject his testimony. We find unavailing defendant's argument concerning the first two statements.

¶ 102   At the hearing on defendant's suppression motion, Detective Grzeda denied that defendant told the detectives in Tennessee that he wanted to return to Waukegan because he had spoken to his grandmother and had an attorney. He also denied that defendant stated that his grandmother had hired an attorney and that is why he wanted to return to Waukegan. Defendant testified, however, that he told the detectives that he wanted to go back to Illinois because his grandmother had an attorney for him. He also testified that he told the detectives he would talk to them in Illinois because his grandmother got him a lawyer.

¶ 103   Defendant contends that the trial court misremembered the testimony when it found that defendant's testimony that he wanted to speak to them in Illinois because his grandmother had obtained an attorney for him was not inconsistent with the detectives' testimony that he did not ask for an attorney. According to defendant, the trial court ignored that the detectives *also* testified that defendant did *not* tell them that his grandmother had hired him an attorney.

¶ 104   We believe that the trial court did not misremember the testimony, that it credited the detectives' testimony, and that it discounted defendant's testimony. The court first noted the

substance of defendant's testimony, *i.e.*, that his grandmother told him not to say anything, that she had a lawyer for him, and that he told the officers that he wanted to talk to them in Waukegan because his grandmother had a lawyer for him. The court then noted that the testimony was not inconsistent with the detectives' testimony that defendant never asked for a lawyer in Tennessee. However, the court *also* noted the detectives' testimony that they gave defendant the opportunity to speak to them in either Tennessee or Waukegan and he, according to the court, "just said" that he wanted to come back to Illinois. The final statement, which defendant does not address, reflects, in our view, that the court found credible the detectives' version of the events—that defendant did not mention that his grandmother had hired him an attorney and that he merely wanted to return to Waukegan to speak to them there. Thus, in the context of this finding, defendant clearly did not invoke his right to counsel during his first two requests to call his grandmother, because they contained no references to an attorney.

¶ 105                    2. Defendant's Third Request to Call His Grandmother

¶ 106   Turning to defendant's third statement concerning his grandmother, defendant stated, "I wanna call my grandma, cuz she told me not to even talk to y'all without, like calling her, cuz she got a lawyer." Defendant told the detectives that his grandmother was in Chicago, and Thomas asked if she was going to be able to help defendant. Defendant replied that she was "trying to send a lawyer" and "she says she got a lawyer."

¶ 107   Defendant argues that his third statement to police that he wanted to call his grandmother, who had "got a lawyer" and/or was "trying to send a lawyer," was an unambiguous request for an attorney. He maintains that the context of his statement made it reasonably clear the attorney he referenced was to represent him during the interrogation.

¶ 108   Defendant relies on several cases that he contends support his argument.  In *People v. Hammock*, 121 Ill. App. 3d 874 (1984), the 41-year-old murder defendant stated during the interrogation that his family ("my people") had a lawyer, he did not know if he could reach the attorney on a Sunday, but his family would produce a lawyer at the police station.  Later, the defendant stated that he would not say anything to police until he had his lawyer.  The court held that the defendant asserted his right to counsel on each of these two occasions.  *Id.* at 876.  In *People v. Harris*, 2012 IL App (1st) 100678, the 39-year-old murder defendant asked if it was "possible" to "have a few days to get an attorney," the request was denied, she was asked if she was requesting an attorney (in which case they were "done talking"), and she responded that she did not have her phone contacts.  *Id.* ¶ 70.  The defendant was then asked if she no longer wanted to answer questions and responded that she wanted to answer them.  The court held that the defendant unequivocally invoked her right to counsel under *Miranda* when she asked if it was "possible" to have a few days to hire an attorney.  *Id.* ¶ 72.  "Any ambiguity in her statement was with regard to how long it would take and the process of acquiring an attorney, not with regard to whether [the] defendant wanted one."  *Id.*  The detective's response that the defendant could not have a few days to hire an attorney and his lack of response to her query about how she could secure her telephone contacts, the court noted, gave the "defendant the erroneous impression that counsel could not be made available or appointed then or in the near future."  *Id.*  The defendant answered further questions only at the detective's prompting.  *Id.* ¶ 74.

¶ 109   Defendant contends that his statement that his grandmother had an attorney that she would send was substantially similar to the *Hammock* defendant's statement that his family would do the same and that a reasonable officer would have been sufficiently clearly apprised by defendant's statement that he was requesting the presence of his attorney.  He also argues that his statement

was as unequivocal as the defendant in *Harris* and that any ambiguity in his statement was in how he would reach his attorney and that he needed to call his grandmother to do so, not whether he wanted one.

¶ 110   Defendant notes that, after he made his request, the police asked him for his grandmother's phone number and left the room to call her.  Yet, Detective Grzeda returned less than five minutes later to continue the interrogation.  He told defendant that Sergeant Thomas was calling his grandmother while simultaneously re-initiating the interrogation.  This created the erroneous impression that counsel could not be obtained, according to defendant.

¶ 111   The State responds that defendant's third request to speak to his grandmother was ambiguous and insufficient to invoke his right to counsel.  It notes that defendant stated both that his grandmother "got a lawyer" and that she was "trying to send a lawyer."  The State maintains that any reasonable police officer could have interpreted these statements as defendant inquiring about the ability of his family members to retain an attorney rather than an unambiguous request for counsel.

¶ 112   The State relies on *People v. Polk*, 407 Ill. App. 3d 80, 98 (2010).  In *Polk*, the reviewing court held that the 17-year-old murder defendant did not unambiguously invoke his right to counsel when he stated he did not want an appointed attorney but wanted to speak to his aunt on the phone to see if she had money to hire a lawyer.  The court concluded that a reasonable officer could have interpreted the defendant's statements as "inquiring about the ability of his family to retain a private attorney rather than an unambiguous request for counsel."  *Id.*  The defendant's statements were equivocal.  *Id.* at 99.  Here, the State asserts that defendant used ambiguous language when referencing counsel, stating that his grandmother was "trying" to send a lawyer.  Any reasonable officer, the State contends, would have interpreted defendant's request to speak to his grandmother

so that he could try to get a lawyer as an inquiry about the ability to retain a private attorney rather than an unambiguous request for counsel.

¶ 113   We conclude that defendant's third request to speak to his grandmother was ambiguous and equivocal and did not constitute an invocation of his right to counsel.  Defendant stated both that his grandmother "got" an attorney and that she was "trying to send" one, which overall lacks clarity as to whether defendant's grandmother had actually retained an attorney and/or would actually be sending one to represent defendant and, further, whether defendant wanted the attorney to represent him during the interview.  In contrast, in *Hammock*, upon which defendant relies, the defendant stated that his family would be sending an attorney and any ambiguity concerned whether the defendant could reach the attorney on a Sunday.  *Hammock*, 121 Ill. App. 3d at 876.  Also in contrast, in *Harris*, the defendant's statement reflected that she was going to retain an attorney and the ambiguity, the court noted, was how long it would take to retain one.  *Harris*, 2012 IL App (1st) 100678, ¶ 72.

¶ 114   This case is closer to *Polk*.  Like the defendant in *Polk*, who asserted that he was trying "to get me a lawyer" and going to "see if [his aunt] got money for it first" (*Polk*, 407 Ill. App. 3d at 98), defendant's statement here that his grandmother was "trying to send a lawyer" was equivocal (on its own and in combination with his statement that his grandmother "got" an attorney) and would not have indicated to a reasonable officer that an attorney was retained for defendant and/or that defendant wanted one to come to represent him during the interrogation.  *Cf. Mays v. Clark*, 807 F.3d 968, 978 (9th Cir. 2015) (" 'My—my step-dad got a lawyer for me.... I'm going to— can—can you call him and have my lawyer come down here?' " was "plainly a request for a lawyer").  Also, defendant never indicated that he wished to stop answering questions until he spoke to his grandmother or until an attorney arrived. Cf.  *State v. Bell*, 2007-1124, p. 1-2 (La.

6/29/07), 958 So. 2d 1173, 1174 (" 'I'd rather wait until my mom get me a lawyer then' " was sufficient invocation of right to counsel).

¶ 115   In summary, the trial court did not err in denying defendant's motion to suppress his statements.

¶ 116                                          C. Sentence

¶ 117   Defendant's final argument is that the trial court's 36-year sentence was excessive, because the court failed to properly consider the mitigating factor of strong provocation.  Specifically, defendant points to the court's finding at sentencing that Daviontay was not serious and merely joking around when he pointed the loaded rifle and threatened to "smoke" defendant.  He asks that we reduce his sentence or remand for a new sentencing hearing.  For the following reasons, we reject defendant's argument.

¶ 118   Generally, where a sentence is within the statutory limits permitted for the felony of which the defendant was convicted, we will not disturb the sentence absent an abuse of discretion by the trial court.  *People v. Powell*, 2013 IL App (1st) 111654, ¶ 31.  A court abuses it discretion where its sentence is unreasonable.  *People v. Sutherland*, 223 Ill. 2d 187, 272-73 (2006).

¶ 119   The Illinois Constitution requires that penalties be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const.1970, art. I, § 11; *People v. Center*, 198 Ill. App. 3d 1025, 1032-33 (1990).  The constitutional mandate calls for the balancing of the retributive and rehabilitative purposes of punishment.  *Center*, 198 Ill. App. 3d at 1033.  This balancing process requires careful consideration of all factors in aggravation and mitigation, including, *inter alia*, the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of the

defendant's conduct in the commission of it. *Id.* The trial court is not required to detail precisely for the record the exact process by which it determined the penalty, nor is it required to articulate its consideration of mitigating factors or to make an express finding that the defendant lacked rehabilitative potential. *People v. Redmond*, 265 Ill. App. 3d 292, 307 (1994). The seriousness of the crime is the most important factor in determining an appropriate sentence, not the presence of mitigating factors, and the Unified Code of Corrections does not mandate that the absence of aggravating factors requires that the minimum sentence be imposed. *Id.*

¶ 120   Defendant, who was 18 years old at the time of the offense, was convicted of first-degree murder. The sentencing range for that offense for an adult offender is 20 to 60 years' imprisonment. 730 ILCS 5/5-4.5-20(a) (West 2016). The trial court's 36-year sentence was 4 years below the midpoint of the sentencing range.[1]

¶ 121   In announcing its sentence, the court noted that defendant was an "extremely impulsive, immature person[.]" Daviontay, it further found, did not provoke the shooting; rather, he and defendant were "kids playing with weapons that belonged in the hands of S.W.A.T. teams and the military. Very dangerous weapons." Defendant and Daviontay were not "serious," were merely acting "cool," and were angry at each other. Daviontay was angry at defendant for telling him to stop. Defendant was angry at Daviontay, and the fact that he "kept on shooting" reflected his anger.

---

[1] Defendant was also found to have personally discharged a firearm and, thus, subject to a 25-year firearm enhancement. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2016). However, the court found that the enhancement was unconstitutional as applied under *Miller*.

¶ 122   Section 5-5-3.1 of the Unified Code of Corrections (730 ILCS 5/5-5-3.1 (West 2016)) sets forth the mitigating factors that a trial court is to consider in imposing a sentence, including that the defendant acted under a strong provocation (*id.* § 5-5-3.1(a)(3) (noting that one ground that "shall be accorded weight in favor of withholding or minimizing a sentence of imprisonment" is that "[t]he defendant acted under a strong provocation")) and that there were substantial grounds tending to excuse or justify his or her conduct (*id.* § 3.1(a)(4) ("[t]here were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense")).

¶ 123   The term "strong provocation" is not defined in the Unified Code of Corrections.  However, the term "serious provocation," which is relevant to reduce an offense of first-degree murder to second-degree murder, encompasses substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and spousal adultery. *People v. Merritte*, 242 Ill. App. 3d 485, 492 (1993). "[S]trong provocation as a mitigating factor at sentencing encompasses a wider range of conduct than that defined as serious provocation under the second[-]degree murder statute." *Id.* at 493. However, the strong provocation must be direct and immediate. *Powell*, 2013 IL App (1st) 111654, ¶ 36. "Mere words, no matter how abusive or indecent, are not considered serious provocation." *Id.* at 492.

¶ 124   Defendant maintains that the trial court should have considered as a mitigating factor in favor of a lower sentence Daviontay's threatening behavior and gunplay.  The court, he contends, ignored the extreme and aggressive nature of Daviontay's provocative behavior.  It also erroneously determined that defendant did not believe that Daviontay was going to shoot him. There was no support in the record, defendant argues, to determine that Daviontay was not serious or that defendant had any reason to doubt Daviontay's threats.  They were strangers to each other

who had been hanging out for a few hours at most. Daviontay was aggressive, prone to picking fights, and enjoyed playing with guns. With the gun pointed at him, defendant was not in a position to doubt Daviontay's threats. Further, defendant argues that the court igored Garbarino's testimony on defendant's ability to discern and respond to threats.

¶ 125 We reject defendant's argument. The court imposed a sentence four years below the midpoint of the 20-to-60-year sentencing range. The trial court noted that it had considered the parties' arguments, the trial testimony and exhibits, the PSI, Garbarino's testimony, the evidence in aggravation and mitigation, the jail disciplinary records, the victim impact statements, the defendant's statement in allocution, and Price's testimony. At the time of the present offense, the court noted, defendant was on probation for burglary ("a situation which was ill-conceived to say the least which was where [defendant] basically saw a car that was running and just stole it without thinking about it, without any real reason for doing it and then crashed the car and ran off"). It was "an impulsive decision." The court further found that defendant did not load the rifle but caused it to discharge. It did not find credible the testimony that defendant fled to Tennessee to wait for an attorney. The court considered defendant's actions to constitute flight and to reflect "consciousness of guilt."

¶ 126 Daviontay, the court determined, did not provoke or incite his own death. The court noted that there was no gang relationship or motive for defendant and Daviontay "to get tangled up with each other." They were "kids" playing with dangerous weapons. The court noted that it did not take seriously the videos and statements made while Daviontay and defendant posed with the weapons. "Suffice is to say that these guys here in this house, this wasn't serious. Nobody was discussing using any of these weapons." Rather, "[i]t was like it's really cool that we've got this

stuff here, and I'm a gangster and I'm a killer and I'm an assassin and I'm this and I'm that and this should be my nickname and things like that."

¶ 127   Daviontay was not threatening defendant, the court found.  He pointed the rifle at defendant at some point, but it was not done in any serious way as if he was really going to shoot.  The court found that defendant was angry that the gun was pointing at him.  Daviontay's response that he would "smoke" defendant was not serious.  "Did [defendant] really think just because he told [Daviontay] not to point the gun at him, did he really think that [Daviontay] was going to blast him, that he was going to assassinate him?  No, that's not reasonable, as so—and it's not just a matter of that [defendant] was too immature to realize that it wasn't reasonable, I don't believe it.  I don't think that's what he thought."  Both Daviontay and defendant were angry.  If defendant was worried, the court noted, he could have walked out the door, not wrestled the rifle away from someone.  It was not self-defense or an unreasonable belief in self-defense.  Nor was it a mitigating factor.  Defendant was an immature and impulsive person "who acted in a very reactionary fashion to attempt to resolve the matter."

¶ 128   Defendant, the court continued, shot Daviontay.  Daviontay was "no threat to" defendant, and he attempts to exit the house.  Defendant "kept on shooting."  The fact that defendant kept on shooting, including many shots to the back and multiple "kill shots," reflected not provocation but anger.  The court found "[p]articularly aggravating" the final shot in by the stairs, which the court characterized as "an execution" and "very brutal act."  As to rehabilitative potential, the court found that the evidence did not weigh one way or the other.

¶ 129   The foregoing findings reflect that the court thoroughly considered and completely discounted the mitigating factor of strong provocation.  Its determination was reasonable.  Daviontay was not alone in handling the weapons in the Kinzer house.  Both on the day of the

shooting and the day before, defendant and the other individuals in the Kinzer house handled, played, and posed with the weapons. Further, on the day of the shooting, Daviontay posted a video on Snapchat, wherein defendant can be heard speaking to his uncle in the background about which type of bullet might be preferable to shoot with. Any claim of shock or surprise that Daviontay pointed the rifle at defendant is not well taken, nor is his claim that he felt threatened or that his life was in danger. Daviontay's alleged statements to defendant that "I'll smoke your ass, bitch" and "I'll kill you in this bitch" reasonably reflected Daviontay's bravado in the context of the activities on that and the previous day, not a threat of violence.

¶ 130   The circumstances of the shooting supported the court's sentencing determination and showed that the court appropriately considered the mitigating and aggravating factors. Critically, the evidence showed that defendant shot Daviontay 10 times, including 5 shots to the back, which reasonably reflected that Daviontay tried to escape. Eileen Thomas, whose testimony the court found credible, related how defendant lowered the rifle and shot Daviontay the final time, an act that the court reasonably characterized as "an execution" and "very brutal act."

¶ 131   In summary, the trial court did not err in sentencing defendant to 36 years' imprisonment.

¶ 132                                III. CONCLUSION

¶ 133   For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 134   Affirmed.